**Lawrence William WRIGHT, Plaintiff,**

v.

**Hon. Daniel McMANN, Warden of Clinton Prison, Dannemora, New York, Defendant.**

**UNITED STATES of America ex rel. Robert MOSHER, Plaintiff,**

v.

**Hon. J. Edwin LaVALLEE, Warden of Clinton Prison, Dannemora, New York, Defendant.**

**Civ. Nos. 66–CV–77, 67–CV–174.**

United States District Court, N. D. New York.

July 31, 1970.

Betty D. Friedlander, Waverly, N. Y., for plaintiff Lawrence William Wright.

William Bennett Turner, New York City, for plaintiff Robert Mosher.

Louis J. Lefkowitz, Atty. Gen., State of N. Y., for defendant Wardens; Timothy F. O'Brien, Asst. Atty. Gen., Manuel T. Murcia, Counsel, Department of Correction, Albany, N. Y., of counsel.

MEMORANDUM-DECISION and ORDER

JAMES T. FOLEY, Chief Judge.

Justice Holmes, dissenting many years ago in Northern Securities Co. v. United States (1903) 193 U.S. 197, at pp. 400–401, 24 S.Ct. 436, 48 L.Ed. 679, while noting that great cases, like hard cases, make bad law also commented that at times judges need for their work the training of economists and statesmen.

The Justice did not include, and it is doubtful that he foresaw with all his wisdom of foresight, that the training for a federal judge might some day encompass courses in the administrative and disciplinary procedures used to handle problems with inmates that arise daily in the large maximum security State prisons spread throughout the nation. This two-judge district court has had a steady contact with State prisoner problems for many years; mainly consisting previously of federal habeas corpus applications. (See United States ex rel. Walker v. LaVallee (NDNY) 224 F. Supp. 661). In this District Court are located two such large New York State prisons, Auburn Prison, Auburn, N. Y., and Clinton Prison, Dannemora, N. Y., wherein are confined prisoners convicted of the most serious crimes, many serving very long sentences. The increase in recent years in this District of filings by State prisoners has shifted somewhat from habeas corpus to civil rights claims under the United States Civil Rights Statutes. (United States ex rel. Hancock v. Pate (NDIll.ED) 223 F.Supp. 202 (1963); Jordan v. Fitzharris (ND Cal.SD) 257 F.Supp. 674 (1966); Hancock v. Avery (MDTenn.) 301 F.Supp. 786 (1969).

The Wright case started in this District Court inasmuch as Wright was confined in Clinton Prison, Dannemora, N. Y., by the filing of a complaint March 11, 1966. Wright is serving a sentence of one day to life under jury conviction of three counts charging sodomy, two counts charging assault and carnal abuse of a child. The late Judge Brennan of this Court dismissed the Wright complaint in a substantial opinion, reasoning there was not sufficient evidence to him from the complaint to warrant intrusion into the internal management of state prisons, particularly so without application first to and exhaustion of remedies in the State courts of New York. Judge Brennan expressed in his opinion full confidence the New York Courts would fashion conscientiously a remedy even if none were precisely present in the New York Statutes to entertain and correct the horrible wrongs, if true, claimed by plaintiff Wright during his confinement in the punitive segregation section at Clinton Prison for violations of prison rules and regulations. (Wright v. McMann (NDNY) 257 F.Supp. 739 (Aug. 31, 1966).

This ruling of dismissal by Judge Brennan was reversed by the Court of Appeals, Second Circuit, in an opinion that attracted nationwide attention in the news media. The appellate opinion is referred to often in text and judicial writings as an important one confirming the jurisdiction and obligation of federal courts to entertain and decide such claims. (Wright v. McMann, 2 Cir., 387 F.2d 519 (Dec. 19, 1967)). Judge Kaufman in the majority opinion established the proposition that State prisoners have the right to seek federal relief ab initio if there is substance to the claimed deprivation and violation of constitutional rights under the Civil Rights Act during the prisoner's confinement. Judge Kaufman quoted verbatim a substantial portion from Wright's handwritten complaint describing in stirring and vivid prose disturbing conditions of his confinement in a so-called "strip cell" in the segregation unit of Clinton Prison. Giving the credit that must be accorded such allegations at the pleading stage, it was held there was enough substance to warrant reversal and remand for hearing of the issues. Judge Kaufman reviewed New York's remedies that might be applicable to this kind of claim and decide such were inadequate for full relief, and further decided a case of this kind was the least likely candidate for abstention. (Wright, supra, at pp. 524–525; Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444; McNeese v. Bd. of Education, etc., 373 U.S. 668, 673–674, 83 S.Ct. 1433, 10 L.Ed.2d 622). Chief Judge Lumbard concurred in a separate opinion "albeit reluctantly" with a statement appealing to me as a judge in a two-judge United States District Court in which substantial State prisoner business is never ending. (See

Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837). Such free-wheeling filings by State prisoners are time consuming and uncontrollable as other litigation may be. Judge Lumbard stated unequivocally in Wright that he would hold if New York made provision for injunctive relief as well as the legal relief seemingly available that the federal courts should abstain for a reasonable period of time to allow the state courts to hear the complaint and take appropriate action. Judge Lumbard decried the fact that the majority court ruling, in which he reluctantly joined, would require a District Court to write some of the rules regarding State prison administration for the treatment of recalcitrant prisoners. He observed it was far better that the states should formulate, supervise and enforce their own rules regarding their State prisons. I agree wholeheartedly. Disciplinary proceedings and their use inside prison walls it should be obvious are matters of the utmost importance. I have found in more than twenty-one years of experience with prison grievances that in New York there is responsible attitude when attention is directed to unfairness that might exist for lack of appropriate and definite legal remedy to correct.

In regard to Clinton Prison inmates the acme of judicial service is furnished. By order of Judges, Appellate Division, Third Department, a regularly scheduled motion Session is held once a month for ten months of the year at the Prison by designated New York judges. The direction is to hear applications for writs of habeas corpus *or other proceedings* regarding detention or confinement. (See Court Ex. 1). By Chapter 658 of the Laws of 1969, New York, effective May 21, 1969, Section 79–c of the Civil Rights Law (McKinney's Consol.Laws of N.Y. c. 6), was amended to confer upon an imprisoned convict the right to injunctive relief for improper treatment where such treatment constitutes a violation of constitutional rights. The void and gap in New York remedies noted by Judge Lumbard was thereby filled by this New York legislation, and later New York Court ruling decided that the amendment was to be given liberal construction and retroactive application. (In re Marcelin v. Scott (App.Div., 3rd Dept. Oct. 20, 1969) 33 A.D.2d 588, 304 N.Y.S.2d 299). However, the stages of the two cases herein have advanced too far along the federal route. The doctrine of abstention, unfortunately, I believe, seems more precarious today to apply than ever, even though common sense and good judgment indicate reliable and clear State remedies are now available that in the interests of federal-state comity should I think be accorded the first opportunity to rule upon claims of this kind charging cruel punishment and constitutional deprivations. (Holmes v. New York City Housing Authority, 2 Cir., 398 F.2d 262, 265–266; see also Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319). However, federal jurisdiction of these actions, based upon provisions of the Civil Rights Act, 42 U.S.C. §§ 1981, 1983, 1985(3), in my judgment, can no longer be questioned under the precise appellate ruling of the Second Circuit in Wright. (See also Rodriguez v. McGinnis (NDNY) 307 F.Supp. 627; Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L. L.Ed.2d 1030; Brown v. Brown, 9 Cir. 368 F.2d 992; Wiltsie v. Calif., Dept. of Correction, 9 Cir., 406 F.2d 515.

Plaintiff Mosher is serving a 40–60 year sentence that he commenced in 1964 on his plea of guilty to Robbery charges. I permitted the filing of his pro se complaint by memorandum-decision and order dated May 19, 1967. The claim involved similar assertions as those of Wright, in that he was being confined in the segregation unit at Clinton enduring cruel living conditions pursuant to administrative procedures and under reasons for such confinement that he claims were violative of constitutional rights. Paragraph 2 of the Mosher complaint alleges that punitive segregation for his refusal, that he admits, to sign a "safety sheet", used in the institutional shops of the prison resulted in punishment out of proportion to the offense. Paragraph

4 refers to observation cell confinements. This cell and its purposes shall be described herein later. Mosher claims the cell was used fraudulently by segregation guards without any formalities being followed and proper reason present when the segregation guards became displeased with segregation inmates conduct and wanted to make living conditions more unpleasant and unbearable than those said to exist in disciplinary segregation. A series of letters to me followed from Mosher after I permitted the filing of his complaint, and in accord with the liberal and informal treatment this court gives pro se writings of State prisoners, some were filed formally as supplemental to the complaint and others were retained in the file in the Clerk's office for reference. The grievances in the letters run along the same lines as those in the complaint except there is description of new incidents that arose between Mosher and the guards in their daily close contact during the segregation regimen. These events resulted in continued segregation punishment for Mosher and prolongation of Mosher's confinement in segregation for a considerable period of time.

Attorney Betty D. Friedlander who acted as attorney for Wright on the appeal continued to act as his attorney for the trial and its preparation. I requested William Bennett Turner, an attorney with considerable experience in matters of this kind to represent Plaintiff Mosher and he willingly accepted such assignment and this Court is appreciative. By formal order dated August 28, 1968, the actions were directed to commence at joint trial on October 15, 1968, and such order noted that a satisfactory and productive pretrial conference had been held with the attorneys. Extensive and productive discovery and deposition procedures were permitted by me to be undertaken to the full extent permitted by the traditional liberality of the Federal Rules of Civil Procedure. Depositions of eight prison officials concerning their knowledge and experience at Clinton Prison were taken. Wardens McMann and LaVallee, Deputy Warden DeLong, Prison Psychiatrist Dr. Freedman, Prison Physician Dr. Peda, several correction officers (guards) with duty assignments in segregation during the times in question, and one prisoner McIntyre were deposed. These depositions were offered in evidence at the trial and are marked as plaintiffs' exhibits. (Plaintiff exhibits are numbered; Defense exhibits are lettered, and references herein to the trial record shall be by the prefix R).

A trial record of 1566 pages was compiled in a trial that covered seven trial days. At the end, I stated the trial had been an education to me although I had experience of twenty years with substantial numbers of State prisoner cases. (R 1553). The recanvass and review of the voluminous record that had to be done following delayed and substantial briefing fortifies this viewpoint. Time could be taken because Wright was transferred from Clinton segregation to another prison. Mosher was released from segregation to general population in December 1968 at Clinton Prison. The entire record of testimony and exhibits is a revealing and eye-opening one in regard to certain aspects of prison life in Clinton Prison. No matter the outcome finally in this litigation, there is a comprehensive record of the testimony of prisoners, obviously the difficult and troublesome ones to handle, during long periods, in their eyeball confrontation with the guards who have the difficult assignment to guard, feed and control them daily in a punitive segregation cell where they were kept around the clock with rare and short periods of release. One definite release from the segregation cell testified to was that the segregation inmates were taken down to the shower room along the gallery for their two-minute shower, as one prisoner estimated its time, every Sunday. The record is fascinating, full of humor and pathos despite the sadness of imprisonment, and as must be expected unfortunately marred throughout with substantial inconsistencies and contradictions, not only by prisoners but correction per-

sonnel. The record, and I had no appetite to undertake its heavy burden no matter its interest, is a portrayal of the real thing; it is prison life as it is, not a stage play or TV or motion picture portrayal. In my judgment, it should be read with care by the executive, legal, legislative and correctional department heads of New York State Government who ultimately must bear the responsibility to insure New York State prisoners are treated humanely as I believe, being one, every citizen of New York wants and expects. The exploration here by trained and able lawyers opens up a facet of New York State prison discipline kept covered too long from the public view. I think it was assumed the public has little interest in the disciplining of the confined criminal element of society or the manner in which they are fed and clothed. However, it is clear that State prisons, or even local jails have become more and more, and rightly so, in this age proper subjects for scrutiny by representatives of the public and the courts when necessary. The higher echelon of Prison management are being held now to account and answer frequently about these matters. (See Judges and Wardens: Teammates for Rehabilitation, by U. S. District Judge George H. Boldt, Judicature, The Journal of the American Judicature Society, January, 1970, Vo. 53); State of Prisons in the United States: 1870–1970; Negley K. Teeters, PH.D., Federal Probation: A Journal of Correctional Philosophy and Practice, Vol. XXXIII, December 1969). No longer can prisons and their inmates be considered a closed society with every internal disciplinary judgment to be blissfully regarded as immune from the limelight that all public agencies ordinarily are subject to. It does seem that the fate and nature of confinement for persons convicted of crime is of little concern to society in general. Many have been smug by rationalizing that if unpleasant problems arise in the prisons, the prisoners brought it on themselves and the less public notice the better.

Security, of course, has been and should be a paramount objective in maximum security prisons. It is a primary consideration I keep in mind throughout the decision I make in these actions. That factor unquestionably must be considered carefully when weighing the propriety and reasonableness of judgments made in these tensest of surroundings to uphold discipline and morale. Such decisions have to be quickly made and their role in my opinion is extremely important to guard against as much as humanly possible, insurrection, riot and terrorizing jailbreak. (See United States ex rel. Wade v. Jackson (NDNY 1956) 144 F.Supp. 458; reversed 2 Cir., 256 F.2d 7). The Wade case involved the sensational New York Sing Sing jailbreak in 1941 in which an unarmed guard was killed inside the prison, and a police officer on a public street in Ossining, N. Y. Judge Youngdahl described the gravity of the relationship so well: "The association between men in correctional institutions is closer and more fraught with physical danger and psychological pressures than is almost any other kind of association between human beings." (Edwards v. Sard (DCDC) 250 F.Supp. 977, 981). However, there are risks in every phase of human life and this State interest can never justify treatment and procedures in prison confinement proven violative of human decency and constitutional rights. The judicial complacency of the past in regard to these problems and cautions for courts to refrain whenever possible as I noted in Rodriguez v. McGinnis (NDNY) 307 F.Supp. 627, has been discarded. The Circuit Court statements in review of this Wright v. McMann action are further proof of the new attitude in these matters. The New York Court of Appeals, responsive and progressive, has been no different in its consideration of State prisoner problems. Several years ago that Court commented in People ex rel. Brown v. Johnston, 9 N.Y.2d 482, at 485, 215 N.Y.S.2d 44, 174 N.E.2d 725, that an individual once

validly convicted and placed under Department of Correction jurisdiction is not to be divested of all rights and unilaterally abandoned and forgotten by the remainder of society. (See also Brabson v. Wilkins, 19 N.Y.2d 433, 280 N.Y.S.2d 561, 227 N.E.2d 383).

Chief Justice Burger, a leader in the simulation of new interest in prison reforms, has stated that prisoners after conviction cannot be considered as human rubbish and that a visit to most prisons will make one a zealot for reform. The diligent defense lawyers in these actions have supplied new decisions passing upon civil rights actions of prisoners confined in State Prisons other than New York. (Holt et al. v. Sarver (ED Ark.) 309 F.Supp. 362, 2/18/70; Hancock v. Avery (MD Tenn.) 301 F. Supp. 786; see also Jordan v. Fitzharris (ND Cal.) 257 F.Supp. 674; Burns v. Swenson (WD Mo.) 288 F.Supp. 4). A unique approach by a Federal District Court to this type problem involving a group of State prisoners confined in Rhode Island is demonstrated recently by the decision in Morris v. Travisono (D.C. R.I.) 310 F.Supp. 857 (1970). The methods of consultation and conciliation were invoked. There was complaint of alleged application of arbitrary and discriminatory rules and procedures in the confinement to punitive segregation for discipline. In a remarkable innovation, the District Judge not only had opposing counsel produce a tentative set of new rules but heard views and considered responses regarding their draft and content from the plaintiff prisoners also. Jurisdiction over the case for 18 months was retained to oversee administration of the new regulations for possible revision after practical application in the Prison. This is a long term supervision for a federal Court but I suppose the hope of final voluntary settlement of prickley issues may make such a program worth the attempt. The outcome should be of great interest to all correction, legal and judicial officers, both State and Federal.

This preface of review, philosophical and otherwise, is set forth in an attempt to interest these executive, legislative, and legal heads of New York in the proposition that possibly the Rules and Regulations promulgated for New York prisons, particularly those relating to segregation confinement and its living conditions and administrative procedures for hearing and disposition of charges that lead to this type confinement or other serious punishment, be reviewed and updated to conform at least in principle if not exact wording to those similar type rules and regulations recommended by responsible sources and recognized as progressive and in step with modern concepts. (See Manual of Correctional Standards (Pl.Ex. 30); Missouri State Penitentiary Rules & Procedures (Pl.Ex. 29); Task Force Report on Corrections, issued May 1967 by President's Commission on Law Enforcement & Administration of Justice, excerpt thereof referred to in Wright v. McMann, supra, 387 F. 2d p. 527).

There is no intention on my part to be critical of the Department of Correction of New York, its personnel or the Wardens and Deputy Wardens of the large maximum security prison involved in this litigation. This record demonstrates clearly that the Wardens and Deputy Wardens advanced through the ranks during many years of experience in a variety of correctional positions with the active and daily problems of prison life. There is no question in my mind of their personal and official dedication to safeguarding the public interest or to their integrity. My relationship with New York State Correctional personnel in a great number of cases involving State Prisoners has always been afforded an attitude of cooperation from them in the processing of prisoner applications and the production of prisoners when necessary at times and places where this federal Court sits, usually several hundred miles from the Prisons. (See United States ex rel. Bruno v. Herold, 2 Cir., 408 F.2d 125, fn. p. 130).

That cooperation has never been better demonstrated than during the trial of these actions when nine prisoner witnesses and the two plaintiffs had to be transported and kept in the Albany area to be available at the appropriate time during a lengthy trial.

Over the years at a number of hearings when State prisoners were before me on the witness stand, I always made it a point to inquire how they were being treated. Ironically, and this is true mostly of the Clinton prisoners, the answer was they were being treated all right. Several whom I recall gave specific examples. I recall one showing his new false teeth with pride, others telling about obtaining the equivalent of a high school diploma, or teaching and learning languages and art. These are small things, of course, but they struck me as signs of humaneness. The prisoners were always dressed in well fitting civilian clothing and none of them gave any appearance that would lead to the slightest suspicion of physical mistreatment or undernourishment. Wright and Mosher had similar appearance during the trial of these cases. Testimony in this record from all the prisoners unequivocally support the conclusion there are no serious grievances they have as inmates in the so-called general population at Clinton Prison. (R 534, 1026, 1034). It should be noted that plaintiffs, Wright and Mosher, in fact by their pleadings and testimony, aim their charges of alleged civil right wrongs mainly against Section 4, a unit of twelve cells, located in a 48 cell disciplinary segregation building, called the "Box" by inmates. There is also criticism against several so-called "dark cells" in the segregation building, and the observation cells located in a separate building. (See Photographs—Def. Exs. A thru K). Wright testified that in 1967, conditions in segregation at Clinton Prison vastly improved. (R 77–87, 170–175). To support a finding that general population living conditions are all right although not in this record, judicial notice is stretched to refer to a book in the vein of a Baedeker travel guide for United States Prisons. It is My American Prisons, by Parisian Jacques Angelvin, and was given capsule review in Time Magazine, December 6, 1968 Issue, p. 33. Dannemora (Clinton) as he appraised it from his actual confinement is thus described:

"Dannemora: Scenically located on the Canadian border; cells resemble those at Sing Sing and are impeccably clean; siesta permitted beween morning and afternoon work periods; ice skating, bobsledding and skiing available in season; clientele permitted to have their own gardens (Angelvin was allowed to raise his own potatoes so as not to have to eat frozen french fries); waiters in the dining room attired in white hats, jackets and gloves."

This description may seem in the nature of a spoof, far-fetched and tongue in cheek. Mosher, however, at the trial of these actions told about groups of prisoners allotted little plots of ground in the Prison yard at Clinton with facilities to store food and cooking utensils, with oil drum stoves provided for outdoor cooking. Mosher testified that at one time when in good graces he was selected as foreman or court manager of one group of 12 or 13 that had space in the North Yard for these unusual privileges of being able to boil a pot of coffee and prepare outdoors their own meal to their own liking. (R. 1009–1012). It was a food episode that led to the compounding of Mosher's problems when confined in segregation. In segregation the prisoners are fed in their cells by two guards coming down the gallery or walking alongside the cells, pushing a warm food wagon. The food as selected by each prisoner in their individual cells is put in one or two bowls by the guards who measure out the portions as the bowls are passed into the prisoner to eat from with a spoon. The humor mixture in the sadness of any prison confinement was the testimony of Mosher that one of the serving guards had the habit of "rubbing his nose and picking his ears" before handing the food through the bars. Mosher asked

him if it was possible for him to use a napkin or pick up the food in a spoon. Mosher said the guard remarked, "What do you think, you are in the Waldorf-Astoria" and Mosher's reply was "No, far from it." (R 1032). Also, Mosher was complacent about the usual direction given when taken to the segregation unit to take off the prison clothes he wore regularly and was given the segregation unit clothing. When asked if the segregation clothes fit by his attorney at this trial, he answered, "They could have been better, you know, but I wasn't going anywhere, you know." (R 1020).

The submission of these actions is in the massive category. Together with extensive briefing, there are filed for Wright by number 250 Proposed Findings of Fact and eleven Proposed Conclusions of Law. Proposed Findings of Fact for Mosher number 254, with eight proposed Conclusions of Law. It has always been my custom and practice to make my findings in my own language and in my own manner, endeavoring to state the fundamental findings that I believe are involved by the issues presented. These detailed findings for the plaintiffs, accurately keyed to the record and exhibits, however, shall be filed with this decision as possibly being helpful, as I have found them, for convenient reference and as an aid to those who may be next to review and consider this substantial record.

Undoubtedly, the plaintiffs' attorneys, to whom the highest credit must be given for motives solely to promote expertly through the channels of the law humanitarianism in prison confinement, seek to use by unmatchable zeal these Wright-Mosher actions as a vehicle for reform of practically every deficiency and flaw that might exist in the administration of the New York State Prison system and the confinement and discipline conditions relating to it. These purposes are laudable. I did knowingly permit substantial latitude in the presentation of the evidence of the plaintiffs, to the obvious and expressed dismay of the defense. (e. g. R 211). This course was

followed since the broad concept of relevancy permits in federal courts greater latitude in presentation of evidence than in other systems. More important, however, my rulings were based upon the knowledge of the numerous complaints filed in this District Court of similar nature under the Civil Rights statutes, the great majority complaining of punitive segregation at Clinton Prison. It seemed better for all concerned to beam the light of day by testimony under oath upon disturbing incidents of claimed physical assaults as well as serious procedural deficiencies in notice of charges, their hearing and review of rules and regulation violations that result in segregation confinement at Clinton. As to some, if there is any element of truth in such charges, they should be investigated and steps taken to prevent their reoccurrence by appropriate revision of the rules with meaningful supervision and enforcement to insure compliance with their wording. However, the search and determination of this record upon my part must remain reasonably within the issues raised by the pleadings and should follow, at least in the Wright case, the guides and observations contained in the appellate writing that remanded the Wright case for further proceedings in this District Court not inconsistent with the appellate opinion. (Wright, supra, 387 F.2d p. 527).

In fairness to New York, it must be noted that changes and improvements have taken place in the living conditions in the 4 Section of the Segregation Unit, the place most complained about, since the initiation of the Wright action and the strong writing in the remand of it that as expected stimulated much other litigation from other prisoners who are or have been confined therein.

As stated before, plaintiff Wright testified that in 1967 conditions in segregation had vastly improved since 1966. (R 170–175). Keeping prisoners nude was discontinued by verbal directive. (R 1258). Warden McMann directed that all inmates in segregation be given at least a suit of long underwear and socks.

(R 1448–9). Normally, inmates in segregation and observation cells are now given bed, sheets, pillow and blankets; shirt, pants and pair of socks. (R 1447–9, see also Ex. 22: par. 33). Plaintiff Mosher testified that two and one-half months before the hearing in these actions before me he was given broom, scrubbing brushes, and hot water whereby he could thoroughly clean his segregation cell as he wanted it. (R 1041). Section 4 prisoners since June 1968 are now allowed to use the small, enclosed patio behind each cell for exercise one hour a day. (R 546, 1025, 1475; Ex. 6: p. 9). Two "dark cells" that are in the segregation building have had their solid steel doors removed, and although there is confusion in the record as to the number of times previously used, there seems to be agreement the Wardens did not know of their use in particular instances and they apparently agree they should rarely be used. (Ex. 1: pp. 26, 28; R 519, 1040; Ex. 2, p. 55). Confinement in these two so-called "dark cells" was unquestionably a cruel one, and it was testified to by Warden LaVallee that their use has been discontinued. (R 1499–1500). Revised Rules covering disciplinary matters and procedures were issued by Commissioner of Correction McGinnis, effective March 1, 1969. (Court Ex. 2). It is extremely important to note that the New York Legislature amended the Correction Law, McKinney's Consol. Laws, c. 43, in many respects. Most important to the issues here are the repeal of Sections 137, 138, 139 and 140 of such law by addition of a new Section 137, particularly in subdivisions (5) and (6) that direct proper treatment of any inmates and proper living conditions for those kept in segregation. (Ch. 476, Section 137, McKinney's Session Laws of N.Y., effective July 8, 1970). It is argued that these belated improvements and changes should not warrant escape from responsibility in this litigation but, to my mind, such should be welcomed at least as signs of recognition in New York that there must be change from past practices. As Justice Frankfurter observed in his dissent in Henslee v. Union Planters Nat. Bank (1948) 335 U.S. 595 at p. 600, 69 S.Ct. 290, at p. 293, 93 L.Ed. 259 "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."

President Bernard G. Segal of the American Bar Association observed in his recent article on the President's Page, June 1970—Issue—American Bar Assoc. Journal, "The deficiencies in present correctional facilities and programs have been adequately identified by a considerable amount of inquiry and research and specific reform proposals for modern and enlightened programs—standards, facilities, services—have been developed by authoritative government and private sources. What is needed now is a nationwide campaign to translate these recommendations into action."

No one ever had and probably never will have all the answers for these disciplinary problems. An eminent witness in this trial, James V. Bennett, testified the maintenance of discipline in prisons is a very difficult, perplexing problem. (R 297). An extensive opinion with studied research was handed down by United States District Judge Motley that touches on practically every facet of New York prison disciplinary procedures and punishment in Sostre v. Rockfeller, McGinnis, Mancusi and Follette (SDNY) 312 F.Supp. 863, May 14, 1970. Governor Rockefeller was named only in one claim and that claim was dismissed against all defendants. In the other claims, substantial money damages were assessed against the other defendants, Correction Commissioner and Wardens, and jurisdiction was retained to allow them an opportunity to submit for approval to the Judge proposed rules regarding New York prison practices and disciplinary procedures required by the opinion. One of the issues of great importance, but not present here, was the right of prisoners to freedom of political expression when confined. There is scholarly and thorough research of the problems of jurisdiction, immunity of the State officers and the compensatory and

punitive damage award, that may forge the way for authoritative and definite rulings by higher judicial authority. The District Courts in my opinion are in dire need of further guidance in these areas. The hearing requirements and procedures outlined by Judge Motley to be promulgated and followed to accord with due process are bound, I believe, to create serious divergence of viewpoint. However, the dialogue, administrative and judicial, that will now occur will be beneficial to obtain the sensible and workable improvements in these prison situations earnestly desired by many. (See Nolan v. Scafati (DC Mass.1969) 306 F.Supp. 1; Roberts v. Pepersack (DC Md.1966) 256 F.Supp. 415.

■ First, it is urged that the present actions may be treated as class actions pursuant to Federal Rule of Civil Procedure 23 provisions, as applied in Jackson v. Bishop, 8 Cir., Blackmun, H. A., 404 F.2d 571. The Jackson case involved the use of a leather strap to flog the prisoner on his bare buttocks as an approved disciplinary measure in the Arkansas penal institutions. New York has definite prohibition against physical punishment or abuse of any prisoners. Sound writing indicates such conversion to class action ordinarily is not appropriate nor so intended to apply in mass tort cases where damages, liability and defenses affect individuals in different ways. (Class Actions—Wright—47 F. R.D. 169–185, at p. 179; see also Washington v. Lee (MD Ala.) 263 F.Supp. 327, 330–331, aff'd per cur. 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212; Green v. Wolf Corp. et al., 2 Cir., 406 F.2d 291; City of New York v. International Pipe, etc., 2 Cir., 410 F.2d 295). These actions shall be treated only as individual ones, tried together by consent. Plaintiff Wright seeks money damages in the amount of $10,000.00 and injunctive relief for the alleged violations of his constitutional rights. Plaintiff Mosher seeks only injunctive relief and has waived expressly any claim for award of money damages. The issues in each action shall be discussed and decided separately. There is important testimony and exhibits common and pertinent to both, but essentially, in my judgment the number of issues necessary to decide are relatively few, with focus of the search narrow inasmuch as it must remain reasonably within the limits and purposes of the appellate remand decision by the Circuit Court of Appeals in Wright.

I

WRIGHT

The pattern for the Wright findings to be made is laid out in the appellate writing:

"We are of the view that civilized standards of humane decency simply do not permit a man for a substantial period of time to be denuded and exposed to the bitter cold of winter in northern New York State and to be deprived of the basic elements of hygiene such as soap and toilet paper. The subhuman conditions alleged by Wright to exist in the "strip cell" at Dannemora could only serve to destroy completely the spirit and undermine the sanity of the prisoner. The Eighth Amendment forbids treatment so foul, so inhuman and so violative of basic concepts of decency. Trop v. Dulles, 356 U.S. 86, 100, 101, 78 S.Ct. 590, 597, 598, 2 L.Ed.2d 630." (Wright v. McMann, 2 Cir., 387 F.2d 519, at 526).

Of course, this general statement must be related to the particulars developed for Wright at the trial in order to perform properly my function as the factfinder regarding the essential elements necessary to be proven to support his claim of deprivation and violation of federal constitutional rights and privileges. It should be emphasized from the record there is nothing to support a contention that segregation for a period of time and under proper conditions in a State prison to enforce discipline is unconstitutional per se. Witness Bennett, with long experience as nationwide director of federal prisons, testifying for the

plaintiffs said it was perfectly proper for a time, that we cannot abolish segregation cell blocks, and that we have to have them even in this new day of prison reforms. (R. 255, 293). Dr. Joseph Satten, a physician specializing in psychiatry, eminent also in this field of study of prison confinement and its consequences, and Chief of the division of law and psychiatry at the Menninger Hospital and Foundation, training qualified psychiatrists for correctional service, gave for this record an illuminating discussion concerning confinement problems in major prisons and its effect upon the human inmates. (R. 412–478). He did not rule out either the need for punitive segregation confinement although he emphasized the care to be taken concerning its conditions and the length of its use due to the serious impact it may have upon certain prisoners due to their individual mental and physical attitudes and capacities. (R. 471–473). It is interesting to note that this doctor who has devoted his life to the study of prison confinement with extensive practical contact with and observation of many prisons does not feel an inmate should be entitled to counsel when charged with violation of prison rules and regulations. (R. 474).

I find with little difficulty from this record that in 1965 and in 1966 when Wright was confined to punitive segregation, such confinement in view of certain living conditions that existed then in the so-called "strip cell" and in a state of complete nudity was cruel and unusual infliction of punishment as that clause of the Eighth Amendment to the United States Constitution should be interpreted and applied. There is no preciseness to define and apply this constitutional prohibition but sensible guide for assistance comes from an opinion of the highest judicial authority in the land that: "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 99–101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630; see also Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793.

Together with the evidence in the record in my judgment to support this finding of cruel and unusual punishment inflicted upon Wright in 1965 and 1966 in certain periods of his segregation confinement, there is the unusual feature that the defendant Wardens' Answer in the Wright action filed in this Court April 26, 1966, admits several elements that on their face give serious concern about the segregation cell conditions under which Wright was confined, and would be ones ordinarily involved in dispute. The first affirmative defense describes Wright as a "glib psycopath", (he has been confined to mental institutions on several occasions); alleges that it was the practice during those years to place certain inmates in what was known as a strip cell at the time of their reception in segregation; that (and this clause is verbatim) a strip cell has only the bare necessities and at times the clothing is taken from the prisoner and at night he is given a blanket to sleep upon the floor; that the practice to keep a prisoner, first in a strip cell, as admittedly Wright was kept for at least some time, was routine treatment in the interests of prisoner discipline and to minimize the dangerous propensities certain prisoners might have in regard to their person and the ordinary prison furnishings in a cell.

From this Answer itself, and it is noted in the Wright Appellate opinion in fn. 15, the justification sought to be established by the pleading that certain prisoners must be kept in a strip cell because they may become violent, tear the cell up, and so forth is destroyed by the admission that it was routine for inmates when first received in segregation to put them in a strip cell. Unquestionably, the stripping of the cell and the nudity of Wright was for discipline, alone, and no facts are shown to support possible conduct on his part that would imperil himself or the cell. Wright was placed in such barren confinement nude, and I so find, when first received on February

18, 1965 and February 9, 1966. Therefore, I find it was done purely for disciplinary purposes and not from any tendencies exhibited that gave reasonable grounds for fear of suicide or destruction of prison property.

According to a single page, sparse interdepartmental communication dated April 24, 1954, inmates placed in segregation for disciplinary reasons other than for refusal to work were to be placed in 4 Section upon arrival in segregation for 30 days. (Ex. 19). Further, Rules for the operation of segregation were issued by Deputy Warden DeLong, August 9, 1967, as a reissue of the 1954 Rules. (Ex. 22). A most important rule therein is No. 33: "Inmates in a strip cell and observation cell will be issued one each pad, blanket, shirt, pants and a pair of shoes. (No shoe strings or belt will be issued)." This instruction came after the Wright confinements.

In 1965 and 1966, the confinement that Wright complains of was harsh and rugged in the 4 Section. Deputy Warden DeLong described the activity of the day in this Section. (Ex. 2: p. 133). Strip, at least during the times in question, meant literally the everyday sense of that word. The light bulbs were removed in the 4 Section, and the only fixtures an inmate had in the cell during a long day were a toilet and washbowl. Deputy Warden DeLong in his deposition, explaining these features, said the inmate in 4 Section did not have a stool or anything to sit on; it seems to have been the practice not to furnish a bedstead, and in any event the bedding was removed during the day from 7:30 A.M. to 10:00 P.M. (Ex. 2: pp. 37-47). There was no radio or smoking privileges, and the reading material was very limited. The inmates of 4 Section were on their feet all day from 7:30 A.M. to 10:00 P.M. with no place to sit except on the floor or toilet bowl. As noted previously, they had to eat from a bowl with a spoon and had to fashion their own way to handle the bowl to eat. (R. 1028). Another requirement only for 4 Section was that the inmates stand at attention at the door of their cell in the 4 Section every time correction personnel of every type would pass the cell upon the gallery. This was no written rule, but such practice was enforced. (Ex. 2: pp. 108, 110, 133-34; R. 69, 532, 597, 1021, 1066, 1234). Deputy Warden DeLong said standing at attention would help them sleep at night. (R. 1233). Wright was kept for a number of days in 3 Section completely nude and the segregation cell in which he was confined was stripped of all furnishings, leaving only the toilet and sink. (R. 158-61, 70, 368, 571, 1193, 1220-1, 1535; Ex. 6: p. 12; Ex. 9: p. 8; Ex. 39: pp. 168, 248; Ex. 41: p. 22). Section 3 was used for strip cell confinement when so ordered in the same manner as 4 Section strip cell. I find that nudity was definitely used as part of the disciplinary punishment with the thought to demean, if nudity so does. I also find that part of the strip cell treatment was to keep the cell in not too clean a condition. The strip cell inmate was only furnished a rag and insufficient scouring powder to clean it with. No program to clean it between inhabitants existed. (Ex. 2: pp. 69, 174, 653, 1022, 1236). Warden McMann changed certain customs of nudity and cell conditions, after he found out about Wright. (R. 1192-3, 1220, 1256-8, 1448-9, 1457). Eyeglasses were taken from strip cell inmates, and were taken from Wright for a period of days; this practice being changed in 1967. (R. 88-9; Ex. 5: p. 31). I find that Wright was deprived of hygienic implements inside the strip cell, i. e. those common to every day life, such as soap, towel and toilet paper, and that these things would be kept on the window sills outside the strip cells, only to be handed in by the correction officers upon request according to the testimony of Warden McMann. (R. 1459). Under this arrangement, it is not difficult to believe, and I so find that at times these requests would be ignored either deliberately or by reason of the guards being unavailable at the propitious time, and I find as testified to by Wright and several inmates that

on occasion they had to use their hand to finish their toilet use. (R. 327, 481, 545, 571). In the observation cell where Wright was confined in April 1965, there was no toilet or sink in the cell, and the procedure to go to the bathroom was more complicated in that when the call of nature came the inmate had to at times wait for the one guard engaged in making his rounds to call in another guard to accompany Wright to the toilet facility. (R. 191–2; 647).

Of course, the temperature maintained in 4 Segregation Unit during the winter months is very important when the finding is made that Wright was kept completely nude in 1965 for 11 days and had to sleep on the cement floor without bed or mattress, and was kept nude under the same conditions for 21 days commencing in February 1966. (R. 61, 70–71, 77, 79, 231; 130, 149, 1145–6, 1192, 1306–07, 1348, 1390; Ex. 43).

Deputy Warden DeLong admits Wright was nude for 8 days in 1966. (R. 1248). Correction Officer Kennedy, often in charge in 4 Segregation, said Wright was nude in 1965. (Ex. 6: 22). Wright said for first two days in 1965 there was no heat in the radiator in his cell (each segregation cell has its own radiator); that in the late afternoon shift the windows were open and making it very cold, although his estimate was that the temperature in his cell was 35°–40°, and not a sub-zero temperature. (R. 225–232, 527–528, 575). I am quick to say there is no intent on my part to imply that sleeping on a concrete floor with no blanket or mattress, may not in itself be inhumane unless good reason from violent conduct of an inmate justifies such type of treatment—unquestionably harsh. The eminence of Director Bennett was recognized in Jackson v. Bishop (DCED Ark.) 268 F.Supp. 804, 813, and from his long experience he testified that at times an inmate might become a suicidal risk, uncontrollable and violent, that taking the clothing away might be necessary, although in the federal prison system an inmate may be deprived of clothing only when so prescribed by a medical officer. (R. 260). Director Bennett gave sensible reasons why the standing at attention at the door cells might be needed for short periods of time to check the segregation inmates if not done for pure harassment. (R. 268). He said that an inmate can properly be deprived of his bed and sheets if he uses them improperly or he is continuously abusive, but he should never be required to sleep on a bare floor. (R. 266–267).

In paragraph 12 of his complaint, filed on March 11, 1966, Wright claims he was "without clothing and entirely nude for several days" during his 1965 segregation confinement, after which he was given what he describes as a thin pair of underwear. In regard to the 1966 confinement, he seems to claim nudity during most of the time he was left in the 4 Section, asserting the sub-freezing temperatures caused by the deliberate opening of windows by the guards during both confinements. The Almighty could not penetrate the contradictions in this record in that regard and the testimony concerning heat is practically in the same impenetrable category. Seven guards testified the temperature was always comfortable, and much of their testimony was that it was so comfortable they worked in their shirtsleeves during the hours when temperature is in serious dispute. (R. 1140, 1196, 1275, 1318, 1386, 1433).

However, there was an unexplained lack of a thermometer in the segregation unit to support the guards' feeling of comfort, and most important to me I find support for Wright's and other inmates testimony that the cells were kept cold at times for discipline by the lack of any entry in the log books about the prevailing temperatures during certain portions of the day. This seems to me an effective way to insure proper temperature by imposing as a routine obligation upon the guards to log the heat temperature at certain times of the day and night in the log book. I accept, at least in regard to Wright, particularly when combined with his nudity and lack

of pad or mattress, that the temperature was cold to an inhumane degree, and caused extreme discomfort. (R. 70, 227-8, 527-8, 576, 654-5; Ex. 9: 8; Ex. 39: 66). So I find Wright was kept nude for 11 days without bed or mattress under cold conditions for several nights of those days although a radiator in the cell was turned on after two days, and he was kept nude in 1966 in 4 Segregation Section under similar conditions for certain portions of 21 days. (R. 225, 230, 128-9, 130, 149).

 There are a number of matters about which proof was taken and concerning which the dedicated attorneys for the plaintiffs want considered as issues under the framework of the pleadings in both these actions but I am not so inclined. Many of these issues are peripheral to and not directly involved I believe reasonably under the Wright-Mosher challenges. Proposed Findings of Fact, Conclusions and detailed decree has been submitted in their regard. Generally, I do consider it unwise that in these days of prison reform on its own the State does not make certain changes, but such thinking on my part does not create federal constitutional issue. The question of legal assistance by one prisoner to another has been finally settled by the United States Supreme Court in Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718. Such assistance can no longer be prohibited, but can be reasonably regulated by the prison officials. In regard to such problems at Clinton Prison, United States District Judge Palmieri of the Southern District of New York as ruled that it is clear that legal assistance of prisoners by other prisoners in preparation of legal papers, as well as access to law books, are not prohibited, but simply subject to reasonable regulation and control by the Warden. Such ruling I accept as controlling here. (United States ex rel. Scott v. LaVallee, (SDNY) 316 F.Supp. 1407, 10/29/69). The deprivation of Wright of his Bible he claims he wanted while in his segregation cell for several days, and the custom not to allow him or other segregation inmates to attend corporate religious services, I do not find ascend to the proportion of federal constitutional violation under this record. (See Cooper v. Pate, 378 U.S. 546, 84 S. Ct. 1733, 12 L.Ed.2d 1030). It does seem to me that if any inmates at any time should be allowed reasonable access to religious texts, ceremonies, and counsel, if they are sincere, they surely should be those confined in the segregation unit for incorrigibility and infraction of Prison rules. Wright testified he had a Catholic Chaplain visit him in segregation in 1965 and received ashes from that Chaplain in 1966. (R. 407-408). I do find that a doctor with an inmate orderly visited and made the rounds of every segregation cell daily. The plaintiffs' attorneys contend there should also be at least periodic visits by one of the prison psychiatrists, and also that the guidance and counseling services available rendered by program to the general population should be provided for segregation prisoners. I agree again that if there is any place the need for these services should be apparent is in the Segregation Unit and I would think New York would voluntarily begin to so act in accord with modern prison practices and standards. The power placed in one man, the Deputy Warden, to decide the disciplinary charges and punishment, is an awesome one but I am not going to go so far as to dictate by judicial fiat that a three-man disciplinary committee is constitutionally necessary to so determine. The eminent experts in the trial of these actions did not so contend as an absolute, except to say as is true that three minds may be better than one. (R. 743-4). However, in this regard, appropriate and plain rules unquestionably should be promulgated to safeguard that the one man decision-maker, the Deputy Warden, or the three-man disciplinary Board, if such is created, have procedural written rules with sensible guidelines not only for the hearing role, practically judicial, but also with proper and timely avenues provided for review and formal appeal from disciplinary decisions that

it is clear from this record have the most serious consequences upon a prisoner's imprisonment and release date. In this respect, it seems to me that the directive of Judge Motley for rules and regulations to be submitted on that aspect is sufficient to accomplish the relief sought here. At the time Judge Motley set for the submission of new rules and procedures, or whenever so submitted to her, I hereby accept as the appropriate time such submission be made to me of new rules for disciplinary hearings and review. Jurisdiction is retained for this compliance. There should also be more detailed rules written for confinement in observation cell, a direct issue here, that shall only be used for psychiatric observation unless extreme circumstances dictate otherwise. I believe it is wrong for the Deputy Warden to have the power to hand down UFO sentences, which mean until further orders. Such allow the Sword of Damocles to hang for considerable periods of time and unquestionably must cause mental aggravation and unrest in a prisoner's mind solely because of indefiniteness. For this record, Correction Officer Kennedy testified he knew of inmates confined in segregation for two years. (R. 1328). Deputy Warden DeLong, who apparently has imposed peremptorily a great number of segregation confinement sentences, mostly indefinite, testified in his deposition, quite boastfully as I read it, that if the prisoner in segregation did not come around to the unwritten criteria he wanted, such criteria being subjective and derived from custom, he had the discretion under certain circumstances to keep a prisoner in segregation during his whole term. (Ex. 2: 165). This power, considering that disciplinary officers as Judges, are not divinely inspired to be infallible, must be curtailed by reasonable written regulation of higher authority. This looseness in the imposition of serious discipline punishment is particularly questionable when weighed with the fact there are no official written channels for authoritative and formal review and appeal. Such safeguards are deemed essential and recommended by responsible sources. (A Manual of Correctional Standards, Ex. 30: p. 410; Edwards v. Duncan, 4 Cir., 355 F.2d 993, 994–995). There is promise of some improvement by the Revised Procedure covering Disciplinary Matters issued February 21, 1969, by Commissioner McGinnis, (Court Ex. 2), but I do direct that another look be taken and further improvements be added to conform to a greater extent with procedures recommended by competent sources and adopted in other States. To repeat, rules for disciplinary proceeding are to be submitted to Judge Motley within a certain time period, and if her direction stands, and such is done the new rules should also be submitted to me for approval in these actions. I also find that the interference with the attorney-client relationship involving both Wright and Mosher violated their due process rights. As Judge Motley did, I adopt the view of Judge Keating, dissenting for the three dissenters in Brabson v. Wilkins, 19 N.Y.2d 433, 280 N.Y.S.2d 561, 227 N.E. 2d 383 (1967). There is no support for the fears that unhampered lawyer-prisoner correspondence may endanger security. There are rules for confinement to the observation cell, (Ex. 22), particularly covering confinement by an employee during night periods to such cells, but these rules should be redrafted and submitted to me for approval being considered a direct issue involved here.

I should emphasize again that I am not inclined to make this decision a blunderbuss attack upon the New York State Prison system because such attack is not warranted. New York has adopted new legislation, its prisons have inaugurated new programs for guidance and counselling, and judicial intrusion I think should be cautious and restrained at this stage when apparently good faith effort is underway in New York to correct the conditions I find wrong that existed in 1965 and 1966. I do not intend, as the determined lawyers for

the plaintiffs desire by their submission, to allow this decision that is confined to the extreme circumstances concerning Wright and Mosher to be used as a launching pad to correct every administrative and confinement fault in the New York State Prison system. Those pleas should be pressed upon the Governor, Attorney General, Correction Commissioner, and proper legislative Committees of New York. The basis for any intrusion here at all is restricted to the power of federal courts to intrude when civil rights are violated by federal constitutional deprivations or violations. I seek to impose self-restraint upon my judicial power as herein I recommend to others who judge. I want the disciplinary administrative personnel who really assume the function of a Judge to so act when hearing charges and make serious decisions that cause severe confinement and resulting loss of other privileges and rights that may affect parole and conditional release. In the main, of course, my finding for Wright and the conclusion that his constitutional rights were violated is based primarily upon the combination of the living conditions that he had to endure for periods of time in 1965 and 1966. At that time there was a design in my judgment to avoid written rule-making in the Clinton segregation unit, to put the rebellious prisoner in the hands of the guards under unsanitary conditions that would make him subservient and break him down into a submissive and conforming attitude that was thought in reasonably good faith, I am sure, as being necessary to maintain security and overall maintenance of discipline. There is no doubt that these motivations became part of the system and were handed down by those who had handled prison inmates for years. Unfortunately, it is true that a number of prisoners remain just as desperate and violent inside as outside a Prison and stern measures must be taken which judgment when necessary I do not intend to challenge. The record here bears out a reluctance, however, to indulge in much rule making for segregation confinement, and the Wardens made rare visits to such area of the prison. (R. 1447). Such rules and surprise visits seem essential to insure humane treatment no matter the provocation. To the credit of Warden McMann, he made major corrections in the 4 Segregation Section when certain conditions came to his attention. (R. 1448-9).

The money damages to be awarded Wright as seems prevalent in the application of all legal principles in these claims under the Civil Rights statute enters a complicated phase of judicial writing. Judge Motley covered the leading cases to the date of her decision, May 14, 1970, in Sostre v. Rockefeller et al., supra. Generally, the compensatory damages are to be governed by federal standards. (42 U.S.C.A. § 1983; Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386; Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288; Basista v. Weir, 3 Cir., 340 F.2d 74, 87). Supreme Court Justice Brennan expanded upon these writings, concurring in part and dissenting in part in Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, June 1, 1970, stating that the federal courts are duty-bound to enrich the jurisprudence of § 1983 by looking to remedies of the State wherein they sit. The practical guide I think is contained in Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed. 2d 492 to the effect § 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. Conventional principles of damages, in my experience never too difficult to apply, fit the situation here. Chief Judge Lumbard recently with ease used the traditional elements of compensatory damage while sitting as a District Judge in Connecticut in Arroyo v. Walsh et al., 317 F.Supp. 869, awarding $2500.00 damages for alleged excessive force by police in making an arrest.

I do not minimize the discomfort Wright had to undergo. However, we do not have the usual propositions of

doctor bills, loss of wages, physical injury and possible future physical impairment. Wright is a big, strapping man, and although he testified that under the rigors of his confinement in the cold when nude he lost weight, there is no support for that except his testimony and I refuse to so find. Loss of sleep is believable under the conditions I find existed for periods of the night hours. There are no medical records to substantiate his claims of swollen legs and so forth. (R. 80–87). The doctor did pass his cell daily and there is no record I am aware of with such complaints.

■ I award no punitive damages because such are justified only as a retributive or deterrent measure. Green v. Wolf Corp., 2 Cir., 406 F.2d 291. Also, to be applied is the statement of Justice Brennan in Adickes, supra, that a defendant, such as the Warden here, must act with actual knowledge he was violating a right secured by the Constitution and laws or acted with reckless disregard of whether he was thus violating such right. Although I do not find sufficient to uphold the good faith or probable cause defense, there is not enough in my judgment to find deliberateness or recklessness on the Warden's part to award punitive damages. Further, because of the examples I have noted of correction and improvement in New York prison conditions that relate to issues of this kind, and the legislative and correctional attitude to update and improve to conform to modern penological surveys and studies, there is no need in my judgment for deterrent measures. The dark cells are changed to such extent that their use although necessary in certain circumstances would be minimal. Neither Wright nor Mosher were ever so confined. The injunctive relief I grant, and in each action, the attorneys for each plaintiff, have submitted separate elaborate decrees for detailed relief with many similar provisions. Any decree of injunctive relief should be limited to the relief granted specifically in this decision, and should not entail or cover projections for other relief that I do not decide herein.

■ My conclusions of law for Wright are that the Court has jurisdiction; his confinement under the conditions as described herein in 1965 and 1966 in 4 Segregation Unit at Clinton Prison, Dannemora, N. Y., constituted cruel and inhuman punishment in violation of the Eighth and Fourteenth Amendments; that rules are to be submitted as herein noted that will limit carefully confinements to the "observation cell" to which Wright was confined; permit legal assistance among inmates to each other, and prohibit interference with attorney-client correspondence. That plaintiff Wright is entitled to compensatory damages in the amount of $1500 together with the costs and expenses set forth in plaintiff's Wright proposed decree in paragraph VII. Jurisdiction shall be retained to insure compliance with the directions herein regarding promulgation and enforcement of proposed rules to attain these purposes. The time limits for submission of new rules and regulations that pertain to the matters herein where I made express direction shall be submitted to the Court and served within 30 days on the plaintiffs' attorneys, who shall have ten days to object with right to hearing to be fixed by the Court, if necessary. I have tried to make clear that the time period for proposed new rules and regulations for disciplinary hearings, their decision, review and appeal shall be geared by New York to the submission at the same time as that fixed by Judge Motley. A decree in conformance herewith, if agreed upon, shall be submitted for signature and filing, and if not so agreed upon, to be settled upon five days notice.

## II

### MOSHER

■ I have less difficulty with the claim of this plaintiff than with Wright.

The claim requests no money damages and ironically at the trial there was not the great complaint by Mosher about living conditions in 4 Section, except, of course, his first confinement there took place in 1967. He was not confined nude nor on his part did he make much during his testimony concerning the heat conditions. Mosher, and I find him a believable witness although obviously explosive and fiery, spent five months in segregation in 1967. He was released in September 1967, and on December 14, 1967, for violation of the same rule was sent back to segregation under the usual UFO (until further order) indeterminate sentence where he was then confined for another year. During the last segregation confinement, Mosher was kept for five months in the 4 Section, which although improved was still severe in its living conditions. (R. 1087–8). The trigger for Mosher's first confinement to segregation that caused the second one, revolved around his failure to sign a so-called "safety sheet" in both instances. (R. 1017–8; Ex. 11: 1036–7). This regulation to sign a "safety sheet" was said to be a method to insure that every prisoner read the safety rules before working in the prison shops. I find that Mosher sincerely felt that such document would waive his right to sue the State of New York for damages for personal injuries caused by negligence and that is why he refused to sign. (R. 1018–9, 1061, 1077, 1201). The lawyers and I at the trial could not agree as to the legal significance or construction that might be given to the "safety sheet" and the possible extent of waiver of rights, and Warden LaVallee testifying in Court said he would have no objection to addition of words to the sheet that the inmate was not waiving rights for personal injury claims against State. (R. 1518–19). More important is the testimony of Warden McMann that he did not believe failure to sign the sheet called for disciplinary action at all. (Ex. 3: 28–29). Director Bennett testified the segregation sentence was inappropriate punishment. (R. 243–7).

Other inmates who refused to sign only lost yard and commissary privileges. (Ex. 14: March 28, December 14, 1967). With reliance on this type testimony, I find that the original confinement to segregation of Mosher and its prolongation was grossly disproportionate punishment for the offense committed by him. I also find that procedural safeguards with meaningful review and formal right to appeal in this instance might have averted or corrected this improper punishment. (See Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed. 2d 62; Ex. 2: 77–81, 96–7; Ex. 3: 20, 21). I find that these confinements to punitive segregation being unconstitutionally disproportionate in the beginning are linked clearly to the later violations in segregation. The connection I find is such that the "good time" lost by Mosher resulting from the first segregation confinement carried through to the other segregation charges and confinement and he is entitled to its restoration. Such total good time loss shall be computed by days recited in the decree to be submitted for Mosher. (See Rodriguez v. McGinnis et al., (NDNY) 307 F.Supp. 627; appeal taken for defendants, argued and under consideration by Court of Appeals, Second Circuit). The same ruling rule herein regarding the observation cell and correspondence with an attorney in the Wright discussion apply to Mosher. The procedural considerations that caused Mosher's confinement affect Mosher much more than Wright, and the decree for Mosher to be submitted shall incorporate as acceptable Paragraph 9; subdivisions (b), (c) and (d) of the proposed Mosher decree filed. (See Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287). The time limits are to be the same and should be geared when necessary to the rule and regulation submission requested by Judge Motley. I should note that in this record and in exhibits there is contained the foulest of language. In some parts of our society such language is the popular one of the day. I do not intend to enter that thicket. As one guard stated,

guards and inmates indulge in expletives, and I believe the language is choice on both sides. I can only recommend for reading an article in the FBI Law Enforcement Bulletin, January 1970, entitled "Explosive Words and Phrases". The gist is law enforcement officers particularly must train themselves to exercise superior restraint and patience no matter the provocation.

My conclusions of law are there is jurisdiction in this Court of the Mosher claim; his Eighth and Fourteenth Amendment constitutional rights were violated by reason of disproportionate punishment for offenses committed in violation of prison rules; that the "good time" loss resulting from infractions and related ones discussed herein shall be restored; that he is entitled to injunctive relief to the extent only indicated herein. The time limits set in the Wright action apply here. The decree for Mosher should contain the same provisions for award of costs and expenses as in Wright. The decree shall be submitted if consented to, otherwise settled on five days notice.

In conclusion, I must say reaching decision in these actions has been a difficult task. The issues, many of them probably borderline for consideration in a federal court were numerous and filled with legal complications. The consequences of abrupt and arrogant interference had to be weighed and balanced with the compelling interest to uphold federal constitutional rights in accord with modern precepts. The balance must be kept true as Justice Cardozo said, and there must be equal understanding of the prison administration problems as well as those of the inmates. The problems will work out if fairness and firmness become dominant principles in prison discipline and due regard is given to the immense studies and program recommendations now available as guides.

The exhibits herein, except the five Log Books, (Ex. 38, 39, 40, 41, 42), shall be filed with the Clerk of the Court with this decision at Utica, New York. The Assistant Attorney General attaches security importance to the Log Books and they shall be retained in my Chambers at Albany, to be delivered to a representative for the defendants at their convenience.

It is so ordered.