Mark FRAZIER and Frederick Reiners, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Benjamin WARD, Commissioner, Department of Correctional Services, and Edwin J. LaVallee, Superintendent, Clinton Correctional Facility, individually and in their official capacities, Defendants.

No. 73–CV–306.

United States District Court,
N. D. New York.

Feb. 17, 1977.

William E. Hellerstein, Warren H. Richmond, III, Michael B. Mushlin, The Legal Aid Society, Prisoners' Rights Project, New York City, for plaintiffs; Warren H. Richmond, III, Michael B. Mushlin, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of State of N. Y., Albany, N. Y., for defendants; Timothy F. O'Brien, Jack W. Hoffman, Asst. Attys. Gen., Albany, of counsel.

JAMES T. FOLEY, Chief Judge.

MEMORANDUM–DECISION and ORDER

This suit filed in behalf of inmates of the Special Housing Unit, known as Unit 14, at the Clinton Correctional Facility, Dannemo-

ra, New York, as many similar suits do, constitutes a prolonged litigation. Unit 14 is described in the record of the trial of this case as "a prison within a prison, or a jail within a jail". It is used for the confinement of prisoners who violate institutional rules and are confined therein in segregation for disciplinary purposes. Out of a large prison population of usually 1500 to 1900 inmates, as the amended complaint states, and the trial record indicates, the number of those so confined is actually minimal—there not being more, so confined, at any given time than approximately 20. This two-judge federal district court in this upstate Northern District of New York, has within its boundaries three maximum security prisons or correctional facilities, as now called, of New York State: Auburn at Auburn, New York; Clinton at Dannemora, New York; and Great Meadow at Comstock, New York. The total population of the three averages in the neighborhood of 5,000.

My contact with Unit 14 at Clinton, known to the inmates in their language as "the Box", as a federal judge is unmatchable. I had to consider serious claims challenging on federal constitutional grounds, living conditions involved in confinement there on two previous occasions and render rulings of a very sensitive nature. The rulings were highly important ones. It was my belief from this federal contact and substantial appellate review in one that further need for the federal judicial scrutiny of Unit 14, at least during my service as a district judge, was remote. *See Wright v. McMann*, 321 F.Supp. 127 (N.D.N.Y.1970), *aff'd in part, rev'd in part on other grounds*, 460 F.2d 126 (2d Cir. 1972), *cert. den.*, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972); *Ray v. Rockefeller*, 352 F.Supp. 750 (N.D.N.Y.1973), appeal by plaintiffs dismissed by Court of Appeals, Second Circuit, 1/23/74, for failure to prosecute. However, the necessity to canvass challenges again as to certain aspects of the living conditions and rules governing Unit 14 claimed to measure up to federal constitutional violations and deprivations confronts me for the third time.

The past history of this present suit was set forth in detail in my memorandum-decision and order of December 8, 1974. The heavy burden that the numerous filings by prisoners in this district as noted in *Wright* and *Ray, supra*, was reemphasized in that particular decision by pointing out that this action was started pro se under other inmates names and was dismissed by my decision of July 6, 1973. This decision was reversed by a three-judge panel of the Court of Appeals, Second Circuit, by a 2-1 decision of October 2, 1973, with express remand "to conduct an evidentiary hearing upon the Motion for Preliminary Injunction". Thereafter, in accord with this reversal and remand, I had to write five more decisions. By decision dated December 4, 1973, I appointed The Legal Aid Society, Prisoners' Rights Project, the present attorneys, who filed an Amended Complaint on August 1, 1974. My decision of December 6, 1974, granted their motion for class action maintenance and granted an important discovery motion that directed the answer to an interrogatory that necessitated the search of many records by the defendants of inmates confined in Unit 14 from June 1, 1973 to May 15, 1974. Extensive discovery procedures were undertaken by these experienced and able lawyers of the Prisoners' Rights Project after the remand for evidentiary hearing on a motion for preliminary injunction transforming the directed evidentiary hearing into a full blown trial on four claims in the amended complaint.

The trial commenced May 12, 1975 and ended May 15, 1975. The request for injunctive relief was withdrawn, no money damages were sought, and only declaratory relief on the four claims requested. The trial transcript consisted of 765 pages and was not received by me until August 4, 1975. The formal final briefing with proposed findings of fact and conclusions of law was submitted as of October 6, 1975, but there has been further and consistent communication from the attorneys to the court concerning important legal rulings in the federal courts at every level that pertain to the issues in this action. There has also been attention called to legislative and

administrative developments and changes that have occurred in New York State that have bearing on the issues here.

It has been my experience as a federal judge from practically daily contact in recent years with these state prison problems that good faith efforts to attain needed reforms in the prison system of New York have taken·place. There is evident a desire to attain sensible, practical and realistic reforms. Many of the grievances complained of in the *Wright* case about living conditions and rules of confinement in the segregation unit were corrected previous to the actual trial of the issues. Presently, as we know from widespread media coverage, the problems in New York State prisons are currently undergoing intense examination and investigation, legislatively and administratively. Public hearings have been held in Albany by various committees of the New York State Legislature in the past year to bring public attention to the problems and point up the critical need for their solution. Viewpoints of every kind from administrators, superintendents, penologists, inmates and correction officials and officers were heard and considered·in a worthwhile attempt to reach solutions that will alleviate the unrest that exists in prisons not only in New York, but throughout the Nation. As I noted in *Wright, supra,* 321 F.Supp. at p. 136, no one will ever have all the answers, but I believe these efforts sincerely undertaken will bear fruit; the turmoil will subside. Balanced decisions will be made that will insure fair and humane treatment that New York citizens want accorded to the inmates with safeguards maintained to protect the interests of the public and correction officers in the paramount consideration of security in the institutions. New York has not been by any means a backward state in the maintenance of its state prison system from my contact with such matters. The record in this case as it did in *Wright* and *Ray* is to the contrary. Radical changes have been made by New York legislation, and by administrative rules and regulations promulgated to govern the maximum security prisons, or correctional facilities as now called.

Grievance and liaison committees with inmate representation have been formed in progressive attempts to relieve animosities and tensions that exist in the institutions between inmates and fellow inmates, and inmates and correction officers. The autonomy that Wardens had in the administration of their prisons has vanished. In this confined atmosphere, where large prison populations have to be guarded and serviced, the necessities of life are adequately furnished with programs for education and recreation in old institutions that are kept in a good state of cleanliness and repair. Reasonable access to see the conditions in the prisons and to interview inmates has been accorded to the media. The simple answer to overcrowding as is obvious is to build new prisons, and particularly to construct them in areas where visits are possible and not too distant from home areas where most of the inmates in maximum security prisons come from. Such projects would necessitate substantial expenditures that may not be within reach in these days of financial difficulties in New York. The hard fact of life also is that there is little public enthusiasm for such undertakings and no particular area seems to welcome the erection of maximum security prisons in its confines. New York learned bitter lessons from the Attica tragedy. The present Governor, legislators and correctional officials should not be continuously belabored about it but should be allowed to move forward in new constructive approaches. They should be given the credit due in their commendable efforts to expose the problems to public awareness and attract public support for proper reforms that should be proposed. The closed world that existed in the prisons of New York some years ago no longer exists.

In cases of this kind, I am ever mindful of the limited right the federal courts have to adjudicate claims that arise from state prison confinement. Noted opinions have been handed down from every level of the federal court system that advise extreme caution in adjudicating claims that essentially involve the general administration of a state prison and do not reach, as they

must, to warrant federal court intervention and decree, the level of constitutional violations. *See Rhem v. McGrath,* 326 F.Supp. 681, 689 (S.D.N.Y.1971). Chief Judge Kaufman of the Second Circuit set forth the reason for this principle in striking and memorable language:

It is not only that we, trained as judges, lack expertise in prison administration. Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify *us as a federal court* to command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or *personally* repugnant. *Sostre v. McGinnis,* 442 F.2d 178, 191 (2d Cir. 1971). (Emphasis in original).

The United States Supreme Court has continuously expressed the adherence that must be maintained to this doctrine of restraint from undue interference in the administration of state prisons unless federal constitutional violations and deprivation are clearly evident. The principle has been enunciated again and again with a variety in the language of expression, but the dominant thought remains clear. The most recent statement about the settled principle is contained in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), stating that the federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the State, *citing Preiser v. Rodriguez,* 411 U.S. 475, 491–492, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The *Johnson* case is often cited and states at p. 486, 89 S.Ct. at p. 749:

There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. It is clear, however, that in instances where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated.

The Court of Appeals, Second Circuit, in accord with the general caution of restraint has ruled that prison authorities must of necessity be allowed wide discretion in the use of protective confinement for the purpose of protecting the safety and security of the prison and the general population. Circuit Judge Mulligan in regard to these state prisoner cases, with notable phrase, advises that the federal judges are not ombudsmen charged with the responsibility of reforming the State penal system. *Wallace v. Kern,* 520 F.2d 400, 408 (2d Cir. 1975); *see also McRedmond v. Wilson,* 533 F.2d 757, 766 (2d Cir. 1976) (Van Graafeiland, C. J. dissenting).

Of course, it is and must be recognized that these guidelines and cautions are very difficult at times to follow when broad federal constitutional protections are invoked for a particular factual situation. It is a hard test for the humanism of a federal judge, not to want to correct policies and regulations that to him seem harsh and arbitrary even when he tries conscientiously to apply the principle that personal aversion and predilections are not to enter the judicial mind when grievances arising from state prison administration are presented for judicial decision. It has been noted that the failure in the past of legislators to take proper correctional action to remedy inhuman conditions has eroded the historical reluctance of federal courts to interfere with the administration of penal institutions. *Detainees of Brooklyn House of Detention for Men v. Malcolm, Commissioner,* 520 F.2d 392, at 397 (2d Cir. 1975). Federal judges must be circumspect not to interfere without warrant and subject themselves to the suspicion that "it is the office of a good judge to enlarge his jurisdiction." 1 Works of Thomas Jefferson 121–22 (Federal ed. 1904). The practices complained of in these settings still have to be weighed and assessed in the light that central to all other correctional goals is the institutional consideration of internal security within the correctional facilities themselves. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). It has been clearly

stated by the highest judicial authority of the land and has to be accepted that a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. *Wolff v. McDonnell,* 418 U.S. 539, 555–556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

In my decision of December 6, 1974, I summarized and listed in this order the four claims remaining in the complaint. The brief description set forth was in this order: (1) Adjustment Committee's failure to provide written notice of disciplinary charges before confinement in Unit 14; (2) denial of adequate exercise in violation of 7 NYCRR Section 301.5(6) providing for exercise of one hour per day; (3) imposition of humiliating strip searches with rectal and testicle examination before contact with visitors; (4) denial of effective access to the courts inasmuch as Unit 14 inmates are not allowed access to the prison law library privileges, and are only provided two law books per day, and not permitted to have legal assistance from the inmates in the segregation unit.

In the discussion of the claims in this decision, this order shall not be followed but the claims shall be discussed in order of their importance and constitutional substance as they impressed me as a trial judge and after extensive legal research into this ever changing field of law. My prolonged reflection and search, I believe, is warranted because the caution pronounced so often, unless such are to be placed in the realm of empty words, that federal courts should not interfere in state prison administration unless federal constitutional deprivations and violations are evident and proven.

As often occurs, changes have taken place since the filing of the original complaint in this case, in the rules and regulations that do, in my judgment, affect certain of the issues presented herein, followed by appeals, remand, and filing of an amended complaint. These changes, I find from long experience are usually good faith efforts by New York correction administrators and officials to comply in the majority of instances with the numerous federal court rulings that have been handed down in recent years by the federal courts in the Second Circuit resulting from New York State prisoners filing numerous claims alleging varied constitutional deprivations under the federal civil rights statutes.

Therefore, before entering upon the evaluation of the particular claims and my conclusions regarding them, it might be well to set forth the comprehensive statement of Justice Stewart regarding the important and competing factors and objectives that are present and must be considered, the need to weigh the important interests of society that are at stake, exercising careful appraisal of the impact and consequences that may follow from federal judicial decrees. Justice Stewart summarized them in these words:

An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses. This isolation, of course, also serves a protective function by quarantining criminal offenders for a given period of time while, it is hoped, the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity. Thus, since most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody. Finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. It is in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners.

*Pell v. Procunier, supra,* 417 U.S. 817, 822–823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). (Underscoring supplied).

## I—THE RECTAL AND TESTICLE VISUAL SEARCH

The above description of the subject to be discussed herein is a literal one of the actual incidents that take place when such type search, challenged in this suit, is visually conducted by correction officers when inmates leave Unit 14, the segregation Unit at Clinton Correctional Facility for certain purposes, and upon return to the Unit. The correction terminology for the search, used in New York and elsewhere, is much more euphemistic and less attention calling. The usual examination of these particular parts of the body is termed a strip frisk search.

Title 7 of NYCRR 1020.5, a section of the New York Official Compilation Codes, Rules and Regulations governing correctional services filed December 24, 1974, sets forth the definitions of the type frisking of the person of inmates in the institutions that are authorized.

*1020.5 Definitions* (a) A *pat frisk* means a search of an inmate's person and his clothes while the inmate is clothed, except that an inmate shall be required to remove hat and shoes. The search shall include reaching into the inmate's clothing.

(b) A *strip frisk* means a search of an inmate's person and his clothes after the inmate has removed all his clothing. The search includes a thorough inspection of the clothing and a close visual inspection of the inmate's person, including body cavities. If there is reasonable cause to believe contraband has been concealed in a body cavity, the inmate shall be immediately examined and/or x-rayed by a facility health staff member.

The next section of Title 7, particularly relevant and important to the issue here, was filed December 24, 1974, but was amended substantially in its wording and instructions, effective December 18, 1975, a date months after the trial of this case in May 1975. This section is 7 NYCRR 1020.25 providing as amended:

*1020.25 Special housing units.* (a) An inmate is to be strip frisked before leaving a special housing unit:

(1) if there are reasonable grounds to believe the inmate has a weapon or dangerous contraband concealed on his person; or

(2) if the inmate has a history of committing assaults on facility personnel or of possessing dangerous contraband.

In all other cases, an inmate is to be pat frisked before leaving a special housing unit.

(b) An inmate is to be strip frisked before leaving a special housing unit if he is to leave the facility for any reason.

(c) Upon return to a special housing unit, every inmate will be strip frisked.

Before the amendment of December 18, 1975, Section 1020.25 merely stated:

Before and after a visit, an inmate assigned to a segregation unit or other special housing unit in any facility pursuant to a detention admission, adjustment admission, or protective shall be thoroughly strip frisked. (underscoring mine).

This substantial change in the regulation after the trial of this issue, on a different worded one, in regard to strip frisk searches presents at the threshold the question of mootness. The question was recognized by counsel for the plaintiffs, and their response to it was by letter to me of May 21, 1976, after the extensive brief on all the issues tried was filed with the Clerk on September 10, 1975. The letter shall be filed with the Clerk with this decision. The position without reference to case law on mootness was that under the wording of the change in 7 NYCRR 1020.25, effective 12/18/75, the constitutional infirmity remains because under the new rule, searches are routinely permitted without any justification upon return to Unit 14, and that under the changed section, Unit 14 inmates, allegedly dangerous, must continue to undergo the rectal examination at all times despite a lack of real suspicion that such strip frisk search is justified. I am inclined to agree with this interpretation of the change in regard to mootness being not applicable. It does appear that the strip frisk issue is still open as one within the original challenge as being made routinely

and without reasonable grounds. Therefore, it is my opinion, the issue remains alive even under the new and more detailed terminology of the new and amended Section, 7 NYCRR 1020.25.

Further, independent research of leading case law in the federal appellate system supports this opinion that the doctrine of mootness should not be applied because of the change in the old rule that prevailed when this case was tried. Whether a request for declaratory relief becomes moot depends upon whether there remains a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Preiser v. Newkirk*, 422 U.S. 395, 402, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). In that case weight was given to the fact that the action was not a class action, and this present one as noted previously has been so designated. A factor to be considered is whether there is reasonable expectation the wrong will continue or be repeated. *United States v. W. T. Grant*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *DeFunis v. Odegaard*, 416 U.S. 312, 318–319, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Nieves v. Oswald*, 498 F.2d 802, 813–815 (2d Cir. 1974); *Armstrong v. Ward*, 529 F.2d 1132 (2d Cir. 1976); *Allee v. Medrano*, 416 U.S. 802, 810–11, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974). From my review of these cases, it is my judgment that with the application of their principles in regard to mootness, the issue of the strip frisk search under the amended rule cannot be considered as mooted. It seems clear that the issue of routine strip frisk upon return from inside facility visits for certain purposes or if the inmate has a certain case history of assaults or concealing contraband gives vitality to the issue sufficient to overcome mootness.

■ Also, other considerations must be discussed before reaching the merits of the four claims. Declaratory judgment relief which is the only relief expressly sought in this action now, under 28 U.S.C. § 2201, is a discretionary remedy or power conferred upon the federal courts. *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); *Beacon Const. Co., Inc. v. Matco Electric Co., Inc.*, 521 F.2d 392, 397 (2d Cir. 1975). It is settled that discretion to decline jurisdiction for declaratory judgment exists, but such discretion cannot be exercised against entertainment of controversies that are justiciable and actual. *Muller v. Olin Mathieson Chemical Co.*, 404 F.2d 501 (2d Cir. 1968). In my judgment, the exercise of such discretion at this stage would not be sound, and it is clear that the issues are of importance and the assuming of jurisdiction will serve the public interest. *See Hanes Corp. v. Millard*, 174 U.S.App.D.C. 253, 531 F.2d 585, 591–92 (1976). It should be noted that this judgment is reached despite recent legislation in New York State which provides access to State courts by State prisoners and gives them new rights and remedies in the State courts. *See* New York Civil Rights Law, Section 79–a to 79–j; New York Correction Law, Section 610. *Also*, New York Correction Law, Section 139 establishes a grievance procedure whereby prisoners may petition up to the Commissioner of Corrections, and thereafter to an independent Commission of Correction for review of adverse determinations. Although not specifically provided, it seems probable that in these situations, courts of New York would entertain review of these final administrative decisions under Article 78 of the New York Civil Practice Law & Rules (CPLR). *See Rodriguez v. McGinnis*, 456 F.2d 79, 85 (2d Cir. 1972) (Lumbard, C. J., dissenting), *reversed sub nom. Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

■ The other consideration of importance is whether decision herein on the merits at this District Court level of the strip search issue is barred by previous rulings of this Court. Judge Port ruled in *Sostre v. Preiser*, 73–CV–421, N.D.N.Y., with citation of cases from other federal circuits, that the rectal search was not unconstitutional. On appeal, a Panel of the Court of Appeals, Second Circuit, remanded for fuller development of the record on the issue. *Sostre v. Preiser*, 519 F.2d 763 (2d Cir. 1975). As often happens in these State prisoner cases,

after the concentrated interest of several federal courts, the case faded away, probably due to the release of *Sostre* from confinement after his sentence was commuted. Significantly, in the *Sostre* remand decision, at p. 764, the Court of Appeals referred to the "indignities" of the rectal search, and stated such search would have constitutional implications if done for punishment and not genuinely related to internal prison security. It is also to my mind a noteworthy sign of the attitude of that court toward the "strip search" involving probe of rectum by prison guards which it described as "humiliating". *United States ex rel. Larkins v. Oswald*, 510 F.2d 583, at p. 589 (2d Cir. 1975).

In this record, these possible distinctions are overcome because there has been full exploration of the strip search issue expertly developed with details of the factual circumstances in which the rectal examination is made that in this record are largely undisputed. For these reasons, previous rulings of this Court should not be held to bar consideration of the rectal search issue raised in this action, and particularly so, because of the comments of the Second Circuit regarding the rectal search as pointed out above.

## MERITS OF THE SEARCH

In the record (R) of the trial of this action, there is evidence in detail, practically undisputed, concerning the manner in which this rectal and testicle examination of the frisk strip search was conducted of the inmates who were confined in Unit 14. Under the old regulation that, as pointed out, has been changed, I find as testified to and admitted in a deposition, the rectal and testicle examination of Unit 14 inmates was done routinely. It was necessary for the inmate to undergo it before and after each personal or legal visit, each medical or educational examination, and each court appearance (R. 36, dep. Pl. Ex. 25, p. 21; *see also* Pl. Ex. 29). There is great detail present in the record, again undisputed, as to what took place from the time the inmate was allowed out of his segregation cell for a personal and legal visit and then re-turned after the visit to the same segregated cell. (R. 37, 38, 40, 151–153, 155–156). The security measures taken: Each inmate being placed in a handcuff and belt apparatus to go to his visit, after the strip frisk search, in the receiving room, and the procedures followed in the visiting room in that regard are in the record and uncontradicted. (Pl. Ex. 7; R. 40, 43–44, 155, 191–192; Pl. Ex. 24, pp. 13–14). The finding of these elements of the procedure and search are made with ease due to their practical admission.

The following is sufficient to summarize the events that surrounded the taking of the Unit 14 inmate to and from personal and legal visits within the confines of the Facility. Each Unit 14 cell has a cell in the back of the one in which the inmate is confined. The back door of the inmate's cell to the rear cell area is opened when he is to go for a visit. The inmate is then taken down a rear passageway, accompanied by an average of six correction officers, usually armed with billy clubs. The inmate is brought to a receiving room where he strips naked in the presence of six to twelve correction officers, there to undergo the full strip search, with rectal and testicle visual examination, which will be described below. The inmate, when this is completed, then puts on a different set of clothes. He is then placed in a handcuff and belt apparatus, which was demonstrated to me at the trial by actual attachment to the person. He is then taken to the visiting room without any contact with other inmates, and in the visiting room alternate procedures regarding the handcuffs and belt are followed. They can be removed for the visit, and there is frisking thereafter with a hand held metal detector, of if the handcuff and belt are not removed, the inmate is not further searched or frisked at that time. The inmate in the visiting room is kept under the observation of the correction officers who escorted him. The correction officer in charge of the visiting room is also always present. Once the visit is concluded, the same procedures that were followed for exit to the visit are gone through. The inmate is brought back to

Unit 14 by the same officers, and again is required to strip naked and undergo the full strip search before six to twelve correction officers. After that routine is completed, the inmate then changes into the set of clothing he was wearing prior to the visit and returned to his Unit 14 cell by the back door area.

I find ample support in this record that inmates would forego the legal and personal visits rather than undergo this search procedure, and that in some instances, where court appearances had to be complied with, unfortunately physical force had to be imposed for the required strip frisk search. (R. 159–160, 698).

I reserved decision on the offer of an inmate's affidavit regarding the refusal by inmates to go for their visit if they had to undergo the rectal search. After consideration, the affidavit is received as competent and relevant evidence. (R. 548; Pl. Ex. 28 for id.) There is no question raised or challenge made in this action to the requirement for strip frisk searches when an inmate leaves or returns to the Facility from the outside world.

At the trial, two inmates from Unit 14 were brought to court to testify for the plaintiffs. One was Born Allah, who had in the past thirteen and one-half months to the time of trial been confined in Unit 14 except for twenty-eight days, and David J. Hiney, who to the time of trial was in Unit 14 for ten of the last nineteen months. I believe that the description of the rectal and testicle search examination and the actual circumstances of the conduct is best set forth in the testimony of Born Allah:

A. . . . as I said before that the officer informs us we have a legal visit, he goes through the all-clear procedures and when we are directed from the back door onto the corridor of our back cells itself and directed to the receiving room and the leaving room if you want to call it that, and there the officers that is escorting us puts you like in a semi-circle where there is a table to your back, and your back is at the table, and the semi-circle is around the table from edge—edge to edge—After you are told to strip you are directed by one individual officer to raise your arms, allow him to see your arm pits.

Q. How many officers are present?

A. Every time I came out, just about every time I came out it was always anywhere from six to eight, and there has been occasions where there was approximately 12 officers . . . And one particular officer directs you to lift your arms to examine your arm pits. He asks you to open your mouth, wag your tongue, run your fingers through your hair, lift your testicles, skin back your penis, then you are directed to turn around, lift your feet, left and right foot, and bend over, and that's the most humiliating part of the whole procedure in the sense there would be a lot of oohs and aahs and good show . . . (R. 37–38).

The description of inmate Hiney does not vary too much from the above. (R. 151–153).

Again, there is no dispute or any offer of contradicting evidence that this was the manner in which the rectal search was conducted. (See Pl.Ex. 24, deposition of Deputy Superintendent Gard, pp. 10–11). There was no correction officer who may have actually engaged in the procedures at Clinton called to testify at the trial by the defendants in disagreement with the description of Born Allah and Hiney. Most important, there is no contradiction by testimony or affidavit to the sexually degrading comments allegedly made by the correction officers during the visual inspection of the anus when the cheeks of the rectum were spread as testified to by Born Allah and Hiney. (R. 38, 154, 159). There is no need to set forth herein the exact comments testified to by Born Allah and Hiney during their experiences, but to state only that the expressions are of the type that would be forthcoming in the setting above described, particularly so, when there were no cautions, instructions or guidelines apparently

of any kind given orally or by a writing to control vocal expressions or remarks of the observers. The testimony of one of the two witnesses offered for the defendants at the trial, the Director of Special Housing Programs, New York State Department of Correctional Services, was that he never observed the conduct of an actual strip frisk search of the inmates confined in Unit 14 at Clinton when they were taken from their segregation cells for visits. The other witness, a correctional lieutenant familiar and in contact with Unit 14 and its inmates, shed no light on this accusation of sexual slurs and derisive comments by the escorting correction officers. (R. 616–700). There is no alternative but to find under this strong state of the proof in favor of the plaintiffs that such comments were made by the correction officers during the visual inspection of the once considered private parts of the body.

The plaintiffs in support of their claims of the rectal search and denial of exercise in Unit 14 presented five expert witnesses. It is an understatement to describe these witnesses as eminently qualified by educational background in their particular fields affecting correctional problems. However, most importantly, each had, in addition, a substantial and actual experience of contact in responsible positions with prisons, prisoners, prison life, and were familiar through this contact with the problems that arise in and from it. Their contacts of this kind and educational backgrounds are in the record, in their testimony, and in exhibits, and are set forth in good summary in the plaintiffs' Post-Trial Memorandum with reference to the record on pages 3 through 5. I shall list herein only, with other detail when necessary, their positions at the time of trial:

Donald H. Goff, Director of the National Prison Project for the United States Commission on Civil Rights;

Dr. Frank Rundle, a psychiatrist in private practice. (Previously, Director of the Department of Psychiatry for the New York City Prison Health Services and Chief Psychiatrist for California Training Facility in Soledad);

William G. Nagel, Executive Vice President, The American Foundation, Incorporated, and Director Institute of Corrections of the American Foundation;

Dr. Bernard Rubin, practicing psychiatrist and lecturer at the University of Chicago Law School and Medical School. (Previously consultant to the Council for the Diagnosis and Treatment of Criminal Defendants in the State of Illinois; a member of Governor's Commission for a Unified Code of Correction in Alliance; and a research consultant at the Center for Studies of Criminal Justice at the University of Chicago Law School);

George Bohlinger, Director of Correction and Court Research, Law Enforcement Assistance Administration, U.S. Department of Justice.

This blue ribbon array of experts possessed not only theoretical knowledge, but a practical knowledge of the serious interests at stake that must be balanced in the actual prison setting. Their demeanor in their testimony was impressive and the content of the testimony was persuasive and convincing. It was their unanimous agreement that in view of the isolated confinement in Unit 14, with limited items of bedding and certain type articles for hygiene allowed, with continuous quick searches during absence from the segregated cell for visits and twice a week showers, together with a routine complete monthly search, there was absolutely no justification for the routine rectal search or any reason at all evident that this type of search was necessary, particularly when leaving Unit 14, for preservation of security. This conclusion is bolstered by the testimony of Correction Lieutenant Fuller, who had substantial experience with Unit 14, that nothing had ever been discovered in the rectal searches of inmates leaving or upon their return to the Unit. R. 693. This lieutenant also testified he had no objection to a policy that rectal searches should be made when there exists a reasonable belief contraband might be present in the rectum, and that he "could live with it" if such became the policy at Clinton. R. 699. The appraisal of plain-

tiffs' experts did not reject the need for the search if there was reasonable belief or grounds for a judgment that contraband might be concealed in the rectal area. Their conclusion that the rectal search was unnecessary was based upon the facts that the removals were from sterile cells, with the inmate in handcuffs and belt, and kept under continuous observation of correction officers, and that all such happenings were within the confines of very limited areas of Clinton Correctional Facility. Several of the experts went to Unit 14 for actual inspection of the cells and the inmates before the trial. There are in evidence photographs of the cells, back door area, and exercise yard. Pl. Exs. 10–18. It should be noted again to the credit of New York that no fault was found by these trained men with the housekeeping and cleanliness of conditions in Unit 14, and all agreed segregation units are necessary to enforce discipline and preserve security in prisons, particularly those with large populations, but it was their opinion that segregated confinement for psychological reasons should be for a limited time of 30 to 60 days.

Expert Goff testified there was no reason under the circumstances for the rectal search because the inmates of Unit 14 were leaving "a super tight maximum security unit". R. 289. His basic objection was that the full strip search with rectal imposition was done routinely without any cause. R. 306. It was his opinion that the rectal search, admitting it may be a proper security measure in certain instances, is degrading to the correction officers as well as degrading to the inmates, and when an inmate has to go to court, it results in assault situations to force him to bend over for inspection of rectum. R. 299–300. He testified, frankly, that it was justified, of course, if there was reasonable suspicion of contraband. R. 309. Goff testified he knew of no other State system wherein rectal searches are given unreservedly as is being done in Unit 14, and said the policy of routine rectal searches followed· far outweighs, as being unnecessary, the possible security factors involved. R. 326–327.

Expert Rundle testified he inspected Unit 14 on April 30, 1975, and spoke to the Sergeant in Charge and inmates. He testified also that under the type confinement in Unit 14, the routine rectal search was unnecessary, humiliating and makes the inmate feel helpless, leading to vulgarisms by correction officers. He testified that it is difficult to hide anything of size inside the rectum, and in any event if contraband were concealed inside the rectum, it would not be discovered by visual observance of rectal area. R. 389–399, 440, 447.

Expert Bohlinger, who was Superintendent of Massachusetts State Prison for ten years was surprised, in view of the confinement at Unit 14, that a rectal search was made leaving the Unit; he testified he could see a skin search made coming back, but not rectal; and it was not smart to have rectal search as a matter of routine; and that rectal search in his opinion is only necessary when coming in from the outside. R. 457–458.

Expert Rubin, a physician, psychiatrist and psychoanalyst testified that ". . . don't think we need a doctor or psychiatrist to tell what's wrong with that rectal examination . . . it is a humiliation . . . a psychological assault on the prisoner . . . certainly be a last straw procedure in terms of making one feel like they didn't matter at all." R. 493. He testified, "I find it difficult by the largest stretch of imagination to conceive of this as a security measure." R. 494. He stated the rectal inspection is reminiscent of that of live stock, and it was his opinion many inmates would stay in their cell rather than undergo the rectal inspection by correction officers, and even reject family visits, which to his mind and from experience are most important and critical for prisoners. R. 495–496.

The important question that must be resolved is whether under the facts regarding the procedures carried out for rectal and testicle search there is conduct involved that violates federal constitutional protections. There is a reasoned and per-· suasive district court opinion on this same problem of anal cavity inspection that is

persuasive to me in that it balances out conservatively and sensibly the vital interests that are at stake, namely, to accord the prisoner his constitutional rights and at the same time not strip the prison officials and correction officers of their necessary wide discretion to make on-the-scene judgments in a tense prison atmosphere particularly when dealing with troublesome inmates. The opinion is that of United States District Judge Clarkson S. Fisher, District of New Jersey, *Hodges v. Klein,* 412 F.Supp. 896 (D.C.N.J.1976). In that case, Judge Fisher agreed with the view of now Supreme Court Justice Stevens in *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir. 1975), and other cases with a similar view set forth in the opinion, that prisoners are protected against unreasonable search and seizure under the Fourth Amendment, and do have a qualified right of privacy. I agree also with the *Bonner* view and that of Judge Fisher, and find here under the facts that the anal cavity inspection search done routinely, under the old rule and under the new rule upon return from visits in the Facility, and if possessing a history of assaults on correction officers or possessing dangerous contraband violates the unreasonable search and seizure provisions of the Fourth Amendment. I find and conclude that also under those particular provisions of the new rule set forth and as applied, the constitutional wrong still exists as a recurring one and violates the Fourth Amendment in those aspects. The inmates of Unit 14, from my experience with them, always have a history that is not too favorable, and if such inmates are to be visually inspected, based solely upon their disciplinary record, the routineness of the search without reasonable belief or indication of concealment would undoubtedly cover the majority of inmates in Unit 14.

■ I have no intention to undertake the drafting of rules that would alleviate the constitutional wrong so described and found, but the wording of the preliminary injunction order of Judge Fisher that followed his decision might be helpful. It should be emphasized again that an injunction is not sought in this action, but only declaratory judgment relief.

It is on this 29th day of April, 1976 ORDERED that the defendants, their employees, agents and those acting on concert with them, be and are hereby enjoined from requiring or performing an anal examination of any inmate at Trenton State Prison, such examination consisting of a visual or digital inspection of an inmate's anal cavity or requiring an inmate to bend over and spread his buttocks, except that:

> An inmate's anal cavity may be inspected by the passing of a metal detector over that portion of his body; or

> An inmate's anal cavity may be visually inspected before he enters or leaves the confines of the institution for any reason; or

> An inmate's anal cavity may be visually inspected after a personal contact visit with a friend or relative; or

> An inmate's anal cavity may be visually inspected whenever a prison guard with a rank not lower than Sergeant is satisfied that there is a reasonably clear indication that an inmate is concealing an item in his anal cavity;

. . . .

It is also my finding of fact that under the circumstances in which the rectal and testicle search is imposed for inmates of Unit 14, especially when security interests are not shown to any extent to be jeopardized, that the examination as made under the written old regulations and under certain provisions of the new rule as previously indicated is humiliating and in this record shown by the preponderance of the evidence to be conducted in a debasing manner and not for any genuine security purposes. It is my conclusion, serious as the terminology is, that the rectal and testicle search not based upon reasonable belief standards, and extremely dehumanizing in its method of conduct with routine visual inspection of the rectum by groups of correction officers, constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

We have been told by an eminent judge of the Second Circuit, and in this day of changing times it is apparent to be unquestionably true, that no man can say today what the Eighth Amendment may mean tomorrow. *Mukmuk v. Commissioner of Dept. of Correctional Services,* 529 F.2d 272, 277 (2d Cir. 1976) (per Gurfein, J.), *cert. den.,* 426 U.S. 911, 96 S.Ct. 2238, 48 L.Ed.2d 838 (1976). As that case stated, the concept has been an evolving one in the United States Supreme Court. The latest review of the history of the Eighth Amendment was by Justice Marshall in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, decided November 30, 1976. The cruel and unusual punishment as stated in the Eighth Amendment, after a comprehensive review of the leading precedents, has been described recently by the United States Supreme Court as not a static concept. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The statement referred to often that the clause cruel and unusual punishment "is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice" unquestionably is based upon a desire to promote the better instincts in human nature. *Weems v. United States,* 217 U.S. 349, 378, 30 S.Ct. 544, 553, 54 L.Ed. 793 (1910); *see also Trop v. Dulles,* 356 U.S. 86, at 100–104, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). A definition of the phrase, in my judgment, one most appropriate to the situation here, and one that has received wide recognition is this:

> Generally, speaking, a punishment that amounts to torture, or that is grossly excessive in proportion to the offense for which it is imposed, or that is inherently unfair, <u>or that is unnecessarily degrading, or that is shocking or disgusting to people of reasonable sensitivity is a "cruel and unusual" punishment. And a punishment that is not inherently cruel and unusual may become so by reason of the manner in which it is inflicted.</u>

*Holt v. Sarver,* 309 F.Supp. 362, 380 (E.D. Ark.1970). (underscoring supplied).

## II—DENIAL OF ADEQUATE EXERCISE AND RECREATION

As in the rectal and testicle examination issue of the evidence produced by the plaintiffs in regard to unjustified and unconstitutional deprivation of exercise and fresh air for the inmates of Unit 14, for long periods of time, is formidable, persuasive and practically undisputed. Again, the testimony of the experts that outdoor exercise and contact, amounting to a recreation period while confined in the segregated cells in Unit 14 should be permitted for at least one hour each day because of the circumstances of their confinement and should never be withheld as a matter of discipline must, in my judgment, be accorded great weight in the constitutional determination to be made (Goff 272–274, 343; Rundle 368–370, 373; Bohlinger 451–452, 454; Rubin 478–479; Nagel 734–736).

Unit 14 inmates are in their cells every day during their segregated confinement, in a building now called a Special Housing Unit. Such isolated confinement is usually imposed for disciplinary reasons and the inmates are within their cells most days for at least twenty-three hours a day (R. 30, 128). They are taken out of their cells twice a week for showers; once a week for disciplinary review and meetings; and for certain legal, family and medical visits in the manner described in Part I of this decision (R. 27). They have no other program or other activities and as inmate Hiney testified, there is nothing to do for the greater portion of the day, but sleep in the cell (R. 135–138). The cells are 7½″ × 10″ 0′ × 8″ 0′, and do have bunk bed, foam rubber mattress, combination toilet-sink unit, radiator, and a fluorescent light in the ceiling. There is no chair or table (R. 26, 128, 129). Inmates have adequate bedding, a toothbrush, toothpaste, plastic basin, and are allowed to have writing pads, pen or pencil, and limited amounts of legal and reading material (R. 26–27, 128–129). There is no view of the other cells possible, and no direct sunlight enters any cell (R. 26, 30). Even when these inmates who are confined for breaking the rules of the Facil-

ity are taken for visits, showers, or disciplinary hearings, it is by exit from the back door cell area, and they see no other inmates in Unit 14 (R. 27–28, 37, 130, 151). The confinement is one intended for segregation of the unruly and unmanageable inmate to try to get him to conform, as so many others do, with the customs and regulations of the Facility. All experts agree that this type confinement is a necessity in prison administration.

There is a large outdoor recreation yard in the center of Unit 14, but access to that yard area is deemed a "privilege". The privilege of the outdoor yard is taken away for violations of the inmate while in Unit 14, for violations such as refusing to shave, or refusing to wash eating utensils (R. 32, 144, 573, 697–700). The record of this trial establishes that the open air exercise is withheld regularly, and that many Unit 14 inmates as a result are never or for long periods of time afforded access to the outside yard. For example, on April 16, 1975, only seven out of the twenty-five in the Unit had ever been to the outside yard; two were in the segregated cell section for periods of 272 and 329 days and have never been to the outside yard (P. Ex. 27). Born Allah testified that he was in Unit 14 for a year and never had been to the outside yard and he told in his own words the feeling he had when he had not been to yard for a year without sunshine, exercise or human contact (R. 34).

The position of the defendants sincerely offered as a satisfactory substitute is that the back door area of the cell provides adequate exercise space for the Unit 14 inmates. However, I am satisfied from a fair preponderance of the evidence, and it is my finding that the back door area is not of sufficient size nor physical makeup to provide adequate exercise space for individuals who are in cell confinement on many days, practically around-the-clock. This finding is backed up by considerable testimony of the plaintiffs' experts in this regard, and further upon their consensus that the lack of adequate outside yard exercise in the open air may inflict, depending on the

strength of the individual, grave physical and psychological harm upon the inmate (R. 366, 478, 281, 729–731, 369–370). It was emphasized by these experts that deprivation for long periods for minor infractions in segregation increases tension and instills a sense of helplessness and anger in the prisoners (Rubin 484, Rundle 374). All the experts had no doubt that communal exercise and recreation for an hour a day was a must that should not be lightly taken away, particularly during a prolonged isolated confinement (R. 384–385, 455, 736). Expert Goff termed a good recreation program "as much of a security feature as an armed gun tower", and described recreation as a safety valve (R. 273).

It is important to note that New York by its own Rule 7 NYCRR Chapter VI, Special Housing Unit, Section 301.5(b) seems to agree with the position of the experts.

Except as otherwise provided in this section, every inmate shall be permitted to exercise outside his cell for at least one hour each day and where weather permits such exercise shall be permitted out of doors.

Section 301.8 of NYCRR states:

No inmate is ever, under any circumstances, to be deprived of any item or activity required by the provisions of this Part for the purpose of punishment or discipline.

To counter this explicit writing in the rules and regulations, the defense contention here is that the back door area cell with air able to blow in from the topside to a slight extent constitutes outdoor exercise in accord with the above regulation (R. 577, 684). I am not so persuaded from the trial record made in this case and, this defense contention, in the light of the testimony of inmates actually confined in the segregated area and the experts who viewed this back cell area, must be and is rejected as untenable and unacceptable. Unit 14 at Clinton is the only special housing unit in the state facilities, according to this trial record, that relies on this confined back door cell area for exercise and recreation (R. 588–593). Severe criticism of this area, in colorful

words at times, as sufficient to offer as a proper place for outdoor human exercise was given in their testimony by the experts (R. 281–284, 730–731). As testified, and I so find, the back door cell is by no means outdoor exercise because there is no grass, no dirt, no rain (R. 453–454).

Of course, I realize that as Circuit Judge Friendly noted some inmates in prison are not the most gentle and tractable of men. *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973). I realize and have always realized that the inmates in segregation from my contact, with many prisoner cases, are usually the most troublesome and the most difficult to handle. (*See* Defts. Ex. F, G; *Ray v. Rockefeller,* 352 F.Supp. 750, *supra* ). All the experts in this trial agreed that Special Housing and segregated confinement are necessary to maintain order and discipline in prisons, particularly with large populations. *See Sostre v. McGinnis,* 442 F.2d 178, 197 (2d Cir. 1971) (*en banc* ), *cert. den.,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). Further, I realize that prisoners at times must be exemplarily punished, and equally so in segregation, to deter the prisoner and others from breaking regulations that are necessary for good order. *LaReau v. MacDougall,* 473 F.2d 974 at 978 (2d Cir. 1972), *cert. den.,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

█ Weighing the disastrous psychological and physical damage caused by prolonged deprivation for at least one hour a day from outdoor exercise, clearly proven in this record; the failure to follow the general rule for all special housing units of the New York facilities; with no other facility having back door exercise cells (R. 584); the admission that outdoor exercise periods can be regulated without interference with security; it is my specific finding and conclusion that the practices and procedures in this regard, as shown by the record herein, are unreasonable and inhumane conditions of confinement, and constitute cruel and unusual punishment violative of the Eighth Amendment. Again, there is reasoned and balanced opinion at the District Court level for the extent of the conditions to be met to

avoid such declaration of unconstitutionality in segregated confinement. *See Spain v. Procunier,* 408 F.Supp. 534, 545, 547 (N.D. Cal.1976). In my judgment, without any inclination to write regulations for New York prisons, it would seem that as indicated in that opinion at page 547, a balanced regulation would be one that directs outdoor exercise for one hour per day in the yard at least for five days a week, weather permitting, unless the outdoor exercise is taken away for a period of fourteen days (my estimate) for serious infractions of the rules and regulations governing the segregated Unit. This declaration is, of course, a serious federal intrusion into the management of a Special Housing Unit of a New York State prison but, in my judgment, after careful consideration, the declaration is warranted and really compelled by the evidence in the trial record of this action.

## III—ALLEGED FAILURE TO FOLLOW CONSTITUTIONAL DUE PROCESS PROCEDURES IN DISCIPLINARY PROCEEDINGS WHEREIN PUNITIVE CONFINEMENT IS IMPOSED AS PUNISHMENT

█ This lengthy description is much more elaborate than the initial issue raised by the complaint herein, and is briefly summarized as the (1) claim of the complaint in this action at Page 8. Attorney Richmond, nearing the end of the trial, moved orally for the plaintiffs to amend the complaint to cover Superintendent Proceedings as constitutionally challenged inasmuch as the complaint only challenged those of the adjustment committee procedures. (R. 613–614, Def. Ex. D). Defendants' Exhibit D contains amendments to 7 NYCRR Parts 252 and 253, effective May 19, 1975. This change necessitated the motion to amend that I granted from the Bench.

As happens often in these New York prison cases, several rulings of the federal courts, in my judgment, alleviate any problem relating to adjustment committee proceedings being unconstitutional under the rulings in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that set forth the due process requirements for such

procedures and hearings in disciplinary proceedings in the State prison setting. *Crooks v. Warne,* 516 F.2d 837 at 839 (2d Cir. 1975) spelled out the procedures to be inaugurated: The notice of written charges, at least 24 hours before the hearing, the right to call witnesses or present evidence in appropriate cases, and a statement of reasons for any action taken. A later appeal by New York prison officials only challenged the district court order on the membership of the disciplinary committee, and the time an inmate can be held in segregation prior to hearing. *See Powell v. Ward,* 542 F.2d 101 (2d Cir. 1976). This last case, and the limited appeal taken demonstrates as I have stated so often a commendable attitude and good judgment on the part of New York prison officials to follow willingly court rulings that are fair and subject to practical application.

In my judgment, the evidence produced in this case does not by a fair preponderance support the challenge that the disciplinary proceedings in New York prisons are conducted unconstitutionally. The contention is that it may enter the federal constitutional area of deprivation and violation because the hearings are conducted in an extremely summary fashion. The Supreme Court in its writings pointed up these problems of conducting numerous disciplinary proceedings in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and for that reason set forth with specificity the procedural minimal due process requirements it stated were ". . . consonant with the unique institutional environment". This approach and the limitation of due process requirements were reiterated and clarified further in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). It is clear that the grievances claimed here by the plaintiffs involved questions of procedure that are well within the sound discretion of the New York correction officials. A major complaint here is that there is no provision for a statement of the reasons for the disciplinary action taken by the hearing officer. But, 7 NYCRR Section 253.4(i) does require a written statement setting forth the disposition and *the*

*evidence relied on.* I do not perceive much difference in the result to be obtained by this wording and in any event the slight difference, to my mind, does not present a question of federal constitutional stature. I find a failure of proof to sustain this claim. If New York in its management of prisons has to afford maximum of due process protections, the prisons will soon turn into courts instead of being facilities for the confinement of persons lawfully convicted of crime.

It is significant and important to note the high praise of Chief Judge Irving R. Kaufman of the Second Circuit, concerning New York correction procedures governing discipline of inmates in *United States ex rel. Haymes v. Montanye,* 505 F.2d 977, 980–981 (1974), *rev'd other grounds, sub nom. Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466. This appraisal by Judge Kaufman, with a lengthy and notable experience in this field stated:

> It is, of course, much to the credit of the New York correctional system that such thorough, specific, and sensitive procedures have been codified to govern the enforcement of standards for inmate behavior. P. 981.

From my own review of the evidence and regulations, reinforced by the above description, the claim of lack of due process in the disciplinary procedures is dismissed for failure of proof to support that there exists thereunder federal constitutional deprivations or violations.

IV—DENIAL OF EFFECTIVE ACCESS TO THE COURTS INASMUCH AS UNIT 14 INMATES ARE NOT ALLOWED ACCESS TO THE PRISON LAW LIBRARY, ONLY PROVIDED TWO LAW BOOKS PER DAY, AND NOT PERMITTED LEGAL ASSISTANCE FROM INMATES OR INMATE LAW CLERKS WHILE IN SEGREGATION

To merely set forth this above description of the issue, due to the long experience I have had with front line observation for many years of complete freedom of

access to this federal court by the State prisoners confined in the three maximum security prisons here, and having had the responsibility to decide several important cases as noted that were filed and presented by experienced lawyers in behalf of Unit 14 inmates there probably exists justification without further reason to rule that this claim in the complaint does not state a federal constitutional claim cognizable under 42 U.S.C. § 1983. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. The reality, of course, is that judicial notice can be taken from this case alone that there is evidenced no denial of this right from the filing of the complaint herein and the competent legal representation that was accorded to Unit 14 inmates again in presenting fully their cause in this action to this Court. *See Spain v. Procunier,* 408 F.Supp., *supra,* at p. 546.

There is eye-opening testimony in this case, that should reassure many who worry about New York prison conditions, that New York provides the utmost and best in law library facilities and legal assistance for the inmates. The general library at Clinton contains about 1500 volumes with up-to-date state and federal reports, digests and statutes (R. 85). The library is open 15 hours a week in the winter, and 30 hours in the summer, and there is liberal access by the inmates to the library permitted. [Pl. Ex. 26, access to Int. 15(a), 15(b)]. The library is staffed by certified inmate law clerks, the recipients of extensive training courses, who assist other inmates to become proficient in legal research (R. 93). The succinct expression that should dispel any concern about possible deprivation along this line was the statement of Carter Benjamin, an employee of West Publishing Company, who instituted and supervised the library program, that the New York prison law library program is "the best in the country" R. 86.

The grievance here despite this program and well-stocked library is that the inmates when placed in Unit 14 are not permitted to leave the segregation unit and go to the law library, and are only permitted to receive from the library, upon request, two law books, that are delivered by the Unit 14 correction officers every other night, and then picked up by the correction officers the following morning for return to the library (R. 50, 51–52, 166–167). There is testimony in this record that the correction officials are not concerned about security or ability to accommodate if this restriction were relaxed. (Pl. Ex. 24, p. 14; Pl. Ex. 25, pp. 8–9). Carter Benjamin suggested Unit 14 inmates be allowed actual physical access to the law library in order to allow proper legal research (R. 104).

No matter this testimony, it does not impress me that this custom of delivery of two law books to those placed in segregation for punishment does not comply with constitutional standards. To direct or decree that access to the law library must be permitted would in effect diminish the purposes of the segregated confinement. Most importantly, the fact that in New York State there is now a new Prisoners' Legal Services, with a substantial number of lawyers, located in Plattsburgh to service Clinton; in Albany to service Great Meadow; and in Syracuse to service Auburn, does provide every human assurance possible that Unit 14 inmates, with possibly worthy constitutional claims, will have those claims considered for court presentation. It is just ludicrous with this elaborate service program to think otherwise. There is and always has been complete freedom of mailing allowed by Unit 14 inmates to courts and to any attorney or legal service organization.

The federal courts interfere only when there is shown serious prohibitions against or lack of facilities in state prisons for legal research, and there are no alternatives for the prisoner to obtain legal assistance. *Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970) *aff'd sub nom. Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971); *Procunier v. Martinez,* 416 U.S. 396, 419–422, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Bryan v. Werner,* 516 F.2d 233 (3d Cir. 1975); *see also Smith v. Bounds,* 538 F.2d

541 (4th Cir. 1975), *cert. gr.,* 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). The situations that might provide a basis for federal constitutional challenge on an issue of this kind are not proven here to exist in any degree. There is clearly no constitutional stature to this claim under the evidence presented. In fact, to the contrary, the evidence indicates, as does the representation in the preparation of pleadings and preparation and presentation at this trial, that Unit 14 inmates are well serviced legally, and have unhampered access to the courts. This claim is denied and dismissed for failure of proof.

In conclusion, I want to strike the same note I began with. I treat these cases as among the most serious a federal judge encounters. The extensive writings in the federal courts at every level in these cases are the best evidence of the burdens imposed by them upon the federal court system. We deal with the most tense human relationship that exists, with the risk always apparent to me that injudicious writings and decrees might inflame the tension, and unintentionally be the cause of prison riots. The federal courts, in my judgment, must adhere religiously to the caution that their only jurisdiction is to entertain claims from state prisoners that possess, at least arguably, claims of federal constitutional substance. Otherwise, the federal judges should be content to leave the solution and consideration of the commonplace gripes about prison life to state executives, and legislative and administrative bodies. *See Spain v. Procunier,* 408 F.Supp., *supra,* at p. 537. Second Circuit Judge Van Graafeiland has again expressed recently his "concern about excessive involvement by the federal courts in the operation of state penal institutions." *Zurak et al. v. Regan et al.,* —— F.2d —— at ——, decided February 7, 1977 (Van Graafeiland, C. J. dissenting); *see also* Judicial Restraint, the best medicine, Third Circuit Judge Arlin M. Adams, Judicature, Vol. 60, p. 179, Nov. 1976. It is my state of mind from a vantage point that brings every day contact with state prisons and prisoners and from the experience gained from observation of a substantial number of inmates who appeared before me that there has been no evidence of mistreatment or undernourishment. The inmates who testified in this trial without any fear of retaliation, Born Allah and Hiney, were well dressed in civilian clothes, with all appearances that indicated good health. Each stated at the end of the trial that they were satisfied with the conduct of the trial and the presentation of the case. R. 759–760. New York State should not be too quickly condemned for failure to provide adequate funds for prison operations because, as I recall, the proposed budget appropriation for the fiscal year 1977–1978 requested by Governor Carey is in the substantial sum of Two Hundred and Forty-Six Million Dollars, an increase of 31.9 million over the previous fiscal year.

An appropriate decree in accordance herewith shall be submitted by the attorneys for the plaintiffs in relation to the two claims of the complaint upheld, and incorporating an order dismissing the other two claims as ruled herein. The decree and order, if not consented to shall be settled on three days notice. The exhibits shall be filed with the Clerk of the Court for delivery at their request to the attorneys who offered such exhibits. *See* General Rule 18, N.D.N.Y.

It is so Ordered.